EUGENE AND BARBARA KELLEY, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Kelley v. Commissioner
Docket Nos. 34982-85, 37857-86, 33957-87
United States Tax Court
T.C. Memo 1993-495; 1993 Tax Ct. Memo LEXIS 508; 66 T.C.M. (CCH) 1132; October 27, 1993, Filed *508 Decision will be entered for respondent. For petitioners: Victor T. Fuzak and Richard F. Campbell. For respondent: Moira L. Sullivan, Peter J. Graziano, and James B. Biagi. SCOTT, POWELL
SCOTT; POWELL
MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: These consolidated cases were assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: These are test cases for approximately 300 petitioners who participated in coal mining programs promoted by the Swanton Corporation (Swanton or the Corporation) and its chief executive officer Norman F. Swanton. Pursuant to pretrial procedures established by *509 the parties, the case entitled Harold Chapin and Lila Chapin at docket No. 37857-86 was chosen as the test case for coal programs initiated by the Corporation during 1979 and 1980. The cases entitled Eugene and Barbara Kelley at docket Nos. 34982-85 and 33957-87 were chosen as the test cases for coal programs organized in 1981 and 1982, respectively. Petitioners Harold Chapin and Lila Chapin resided in Williamsville, New York, and petitioners Eugene and Barbara Kelley resided in Armonk, New York, when they petitioned this Court. The cases were consolidated for trial, briefing, and opinion, limited to adjustments arising from investments in Liberty Associates (Liberty) and Lighthouse-80 (LH80). Portions of the record of a prior trial were stipulated into the record in these cases. [3]
Respondent determined deficiencies in petitioners' *510 Federal income taxes and additions to tax as follows: Harold Chapin and Lila Chapin, docket No. 37857-86
Additions to Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6659
1979
$  14,004.15
$   700.21
- 0 -
- 0 -
- 0 -
1980
146,169.00
7,308.45
- 0 -
- 0 -
- 0 -
1981
121,633.00
- 0 -
$ 6,081.65
[1]
$ 36,489.90
Eugene and Barbara Kelley, docket Nos. 34982-85 and 33957-87
Additions to Tax
Year
Deficiency
Sec.6651(a)(1)
Sec.6653(a)(1)
Sec.6653(a)(2)
1981
$ 45,113
$ 4,488.75
$ 2,886.70
[1]
1982
27,184
135   - 0 -
- 0 -
Respondent also determined that additional interest under section 6621(c) was due in each docket. FINDINGS OF FACT Swanton Corporation
Swanton, a Delaware corporation headquartered in New York, was incorporated in 1972 by Norman F. Swanton and Eugene Scalercio and became publicly traded in 1974. Norman F. Swanton had held various administrative and management positions in the securities industry, and Eugene *511 Scalercio was experienced in "securities processing" and asset recovery for securities firms. The Corporation's experience in energy-related business was minimal. In 1976 it provided "cash management services" to a coal mining company. In 1977 the Corporation, through a subsidiary, formed a joint venture with T.C. Bell, Inc. (T.C. Bell) and Kenerco Corporation (Kenerco) to conduct coal mining operations in Kentucky. In 1978, the Corporation acquired Hurd Machinery (Hurd), T.C. Bell, and Kenerco in exchange for Swanton stock. From 1977 to 1984, the Corporation sponsored approximately 50 coal programs as either joint ventures or limited partnerships. [4] Interests in the programs were sold to investors either by brokers or by the general partners of the programs, who were experienced in tax-favored investments. officers of the Corporation purchased any unsold interests. The coal programs contracted exclusively with Swanton subsidiaries for services, including the leasing of mining rights, the performance of mine development and mining services, and the sale of coal. *512 The books and records of many of the partnerships, including LH80 and Liberty, were maintained and controlled in New York by William Turbert, the "Tax Shelter Administrator" of the Corporation. Leasing operations
The coal programs subleased mining rights from the Corporation's wholly owned subsidiaries Kenerco Leasing Corporation (Kenerco Leasing) and Leah Coal Corporation (Leah). These subsidiaries leased properties located primarily in Owsley County, Kentucky. Due to its rocky and hilly terrain the region is not a prime mining area. Little or no prospecting was done, and Swanton's employees had little difficulty entering into the lease agreements with property owners. The subsidiaries subleased mining rights to coal programs in exchange for minimum annual and production royalties. Mining operations
T.C. Bell had a limited operating history and had incurred substantial operating losses from previous mining activities. As of January 31, 1980, T.C. Bell had a negative net worth of $ 91,000 and loans from its parent corporation in the approximate amount of $ 790,000. Most of its mining equipment was financed through equipment leasing companies. Kenerco also had *513 a troubled operating history. As of 1980, Kenerco had no experience as a mine developer and only limited experience in contract mining. With respect to a "mining service" agreement entered into in 1977, Kenerco had encountered certain problems, including problems obtaining coal mining permits. Kenerco subcontracted for some mining services. As of January 31, 1980, Kenerco had a net worth of $ 314,964. Between 1977 and 1981, T.C. Bell and Kenerco contracted to provide mining services and mine development work exclusively for coal programs organized by the Corporation. T.C. Bell was the contract miner for LH80, and Kenerco was the contract miner for Liberty and mine developer for both programs. [5]
Coal sales operations
Low Sulphur Fuel Company (LSF) entered into coal purchase agreements with *514 many of the Swanton programs. LSF did not have an office or any employees in Kentucky; it used the mailing address of the Corporation, and its books and records were maintained in New York. LSF never took possession of coal. Another Swanton subsidiary, Kenerco Coal Sales (Kenerco Sales), was the selling agent for coal mined by Kenerco. LSF played an administrative role, "transferring" coal "acquired" from the coal programs to Kenerco Sales. The Private Placement Memoranda
The Private Placement Memoranda (the offerings) for LH80 and Liberty each included specimen royalty and mining notes, a coal sublease agreement, a coal lease agreement, property leases, a reserve study, a mine development contract, a contract mining agreement, a coal purchase agreement with LSF, a performance assurance, a 65-page tax opinion, and the Corporation's financial reports. The offerings note that "only persons whose income is subject to high rates of income taxation will derive the full economic benefit of any of the tax losses expected to be realized". The offerings projected tax deductions, based on one-unit investments, of $ 122,332 for LH80 in 1980 and $ 130,898 for Liberty ($ 71,282 for *515 1981 and $ 59,616 for 1982). The offerings also included financial illustrations of the projected tax benefits. Swanton had also agreed to pay up to $ 50,000 in legal fees and costs related to Internal Revenue Service challenges of LH80's 1980 tax returns if the partnership reported the financial data supplied by an accounting firm employed by the partnership. The offerings stated that each partner was personally liable for a pro rata share of the partnership's obligations, but this obligation was reduced as the coal program made payments on its liabilities. The offerings also included "Performance Assurances" providing that the Corporation would compensate the coal program in the event the contract miner defaulted on its obligation to mine coal. The amounts payable under the assurances were not to exceed $ 2,500,000, less the value of obligations performed prior to default. Kenerco "paid" Swanton for this assurance. The maximum amount payable under the assurance was the sum of the mine development and royalty notes. If Kenerco did not mine the coal as required, the partnership could invoke the performance assurance that would offset its liability on the notes. Annual reports *516 indicated that "payments to the investors * * * would have no substantial effect on the Company's consolidated financial statements since under the joint operating agreements, all amounts after payment of expenses would become payable to the Company on the nonrecourse and recourse notes". The assurance did not apply in the event of certain conditions: Force majeure, inability to obtain a permit, lack of sufficient quantities of merchantable coal, the pinching off of any seams of coal, any risk relative to the quality of the coal, possible economic infeasibility of mining, and the termination of the contract mining agreement. LH80 consisted of 30 limited partnership units, each requiring a capital contribution of $ 20,000 cash and a $ 15,000 note due in 1980. The minimum allowable investment in LH80 was one unit. The offering provided that unless all investment units were sold by June 30, 1980, none would be sold. Liberty consisted of 35 limited partnership units, each requiring a capital contribution of $ 20,000 cash and a $ 20,000 note due in 1982. On June 12, 1980, Harold Chapin (Chapin) purchased a one and one-half unit interest in LH80. The subscription agreement completed *517 by Chapin indicated that he had "previously invested in coal programs or other tax-oriented investment (such as equipment leasing, oil or gas or real estate syndications)." Although Chapin observed various stages of Kenerco's coal mining operations, he had no way of knowing if the seams of coal he observed were minable or whether the seams were on or near the LH80 property. Chapin did not consult with an independent mining engineer, a geologist, or any other type of coal industry expert. On December 18, 1981, Eugene Kelley (Kelley) purchased a one-unit interest in Liberty. Installment payments of the note were due on June 1, 1982 and October 1, 1982, and no interest was due on the note. Kelley made the installment payments on September 8, 1982 and November 3, 1982. Prior to purchasing his interest in the coal programs, Kelley had no experience in the coal or energy business and did not consult with any persons who would be considered expert in the area. Each subscription agreement appointed the general partner as attorney-in-fact to execute specified documents on behalf of the partnership, including the mine development and royalty notes, purportedly obligating the investor *518 to the extent of his pro rata share of liability for such notes. LH80 background
Harry G. Quint (Quint) was the general partner of LH80. [6] Aside from his involvement with Swanton coal programs, he had no experience with coal investments or coal mining; his expertise was in tax shelters and tax-advantaged investments. Quint was a salesman and a registered representative for Merrill, Lynch, Pierce, Fenner & Smith from 1969 to 1971, and he was associated with Shearson Lehman from 1971 until 1980. At some point, Quint and his family became substantial shareholders of the Corporation. Norman Swanton first contacted Quint in 1977 to engage his services as a coal program "operator". Quint invested in TGN Associates (TGN), a Swanton coal program, but only after he reviewed the tax ramifications *519 of the transaction's structure. Though unhappy with the performance of TGN, he invested in and became the managing associate of QPL Associates (QPL), a 1978 Swanton coal program, which was also a poor performer. None of the coal programs Quint was involved in performed as expected, and mining activities were never started. Despite his lack of expertise, Quint did not hire an independent consultant to review the reasonableness of any of the coal programs. [7]
March/Monarch Corporation (March/Monarch), a Swanton affiliate, was the placement agent for LH80 and received a 10 percent sales commission. Quint also sold partnership interests in LH80. *520 Quint had offered Shearson Lehman the opportunity to market Swanton coal programs, but the firm's tax shelter department refused to do so because the Corporation was unable to mine coal. Quint received an 8 percent sales commission from March/Monarch, and he was also entitled to a management fee of $ .20 per ton of coal mined and sold by the partnership, which was to increase $ .03 per ton for each ton of coal mined and sold in excess of $ 35 per ton. LH80 coal property
Kenerco obtained the following leases during 1979 and 1980 for property located in Owsley County, Kentucky: Lessor
Lease
Lessee
Date
Term
Joel McIntosh
1505
G. Dunaway
12/19/79
1 Year
Bruce McIntosh
3505
R. Gabbard
12/19/79
1 Year
Lucy Gabbard
1805
Kenerco
03/01/80
1 Year
Brown Minter
4005
Kenerco
03/07/80
1 Year
Hayes/Gabbard Heirs
1705
Kenerco
03/08/80
1 Year
Bertie & Verna Gabbard
2205
Kenerco
03/08/80
1 Year
Colson & Rubie Duff
2305
Kenerco
03/12/80
1 Year
Mary Moore
1905/5005
Kenerco
04/21/80
1 Year
Marvin McIntosh
4905/2105
Kenerco
04/22/80
1 Year
Kenerco agreed to pay monthly advance royalties (up to $ 150 monthly) and production royalties (usually the greater of $ 2.00 or 8 percent of *521 the pit price). Kenerco assigned the leases to Leah on May 12, 1980. Leah purportedly sublet the properties to LH80 (the LH80 sublease) on June 16, 1980, the closing date for the LH80 limited partnership offering. [8] Norman Swanton unconditionally guaranteed Leah's representations and warranties of title, as specified in the LH80 sublease. *522 After the closing date Kenerco was notified by counsel that although the coal rights to the foregoing properties were still intact, there were so many leases and numerous conveyances that it could not be determined whether or not they actually affected the leases. Geological Associates report
Russell Gordon Ping (Ping) of Geological Associates, Inc., was the principal author of the LH80 reserve report prepared for Kenerco. Ping was not aware that the report was going to be included in the LH80 offering. Ping had no experience estimating coal reserves in Owsley County, Kentucky, prior to preparing this report. Ping used property boundaries supplied by Kenerco for his study, but Kenerco did not include the Hayes/Gabbard Heirs property. Ping did no prospecting on the properties, and he did not use the Kentucky Geological Survey; instead he used coal seam measurements provided by Kenerco. Kenerco employees told Ping to prepare reserve estimates based upon existing exposures. Ping prepared two sets of estimates, one based on the coal seam measurements reported by Kenerco, which he did not observe, and the other based on what he did observe. The report notes that there "are *523 not enough closely spaced exposures on the Kenerco Corporation properties for the reserve estimates to be considered as proven"; the reserves were inferred. [9] The reserve report mentions nothing about coal quality, though information was available as early as December 1978 concerning the coal quality of the Bruce McIntosh tract. Moreover, some of the coal beds were covered by marine shale, which indicates poor coal quality. Only a small operator would attempt to mine based on the information contained in the LH80 reserve report; a large mine operator would have to do more prospecting. By letter dated June 16, 1980, Norman Swanton informed Quint that the coal *524 engineering report was performed diligently and that he had no knowledge of any facts that would indicate the report was unreliable. Closing the LH80 coal program
The LH80 limited partnership offering closed on June 16, 1980, and the pertinent documents and agreements bear that date. LH80 subleased the coal rights on property leased to Leah. LH80 agreed to pay a production royalty of $ 6.50 per ton for coal mined and sold, with a minimum annual royalty of $ 900,000. The 1980 minimum annual royalty was payable by $ 300,000 in cash and $ 600,000 in the form of a purportedly recourse note due December 31, 1990. No tonnage royalties were payable until the minimum annual royalties were recouped at a production rate of $ 13 a ton. This recoupment rate would require LH80 to pay additional tonnage royalties sooner than a recoupment rate of $ 6.50, and Quint was aware that tonnage royalties were usually recouped at the same rate they are paid. LH80 entered into a mine development agreement with Kenerco. LH80 agreed to pay $ 2,600,000 to Kenerco for mine development, payable as follows: $ 250,000 cash at the time of the partnership closing, $ 450,000 due November 1, 1980, and *525 $ 1,900,000 due December 31, 1990. The note for $ 1,900,000 was payable as to interest only through December 31, 1980. By letter dated June 16, 1980, Kenerco informed Quint that, in connection with LH80 financing, all "contemplated expenditures for the Partnership will constitute mine development rather than exploration expenditures." Kenerco was "to provide all work, labor, material and services" for the commencement of mining the LH80 property, and it was to perform this work within 6 months after the LH80 closing date. [10] Kenerco was subject to liquidated damages in the amount of $ 1,000 per day for each day after December 31, 1980, that the work remained uncompleted. The damages were to be deducted from the contract price. Performance could be extended in the event that delay was caused by force majeure events. The liquidated damages clause remained in effect "until the day upon which all mine development work" was "fully completed". Although the mine development was not timely completed, the contract price was never reduced for delay. *526 LH80 and Kenerco also entered into a contract mining agreement that required Kenerco to mine 733,000 tons of coal: 73,000 tons annually from 1981 through 1988, 74,000 tons in 1989, and 75,000 tons in 1990. LH80 agreed to pay $ 15 per ton plus 70 percent of the net sales price in excess of $ 35 per ton of coal mined. The contract was to terminate when the 733,000 tons were mined or when the sublease agreement expired. The contract required Kenerco to mine the coal in accordance with generally accepted methods of mining and deliver daily production to a loading facility within a 25-mile radius of the coal tract; it also required Kenerco to prosecute energetically the mining operations, to provide coal maps to LH80, to provide monthly reports, to obtain licenses, and to pay reclamation. Kenerco was obligated to submit a mining plan to LH80 within 60 days of the closing date. These duties were excused if it was unable to obtain a permit or, in the event of force majeure, it gave written notice of the extent and probable duration of the conditions of the force majeure. LSF and LH80 entered into a coal purchase agreement whereby LSF agreed to purchase 733,000 tons of coal from LH80, *527 with a guaranteed minimum purchase price of $ 35 per ton. The price of the coal was set by the Corporation. The contract was effective until the 733,000 tons of coal were purchased or until the sublease between Leah and LH80 terminated. LH80 could terminate the contract after 2 years by giving 60 days' notice to LSF. LSF had the right to reject coal with a moisture content in excess of 7 percent, an ash content in excess of 14 percent, a sulphur content in excess of 2 percent, or a caloric value of less than 12,000 btu -- standards established by the Corporation. Despite LH80's obligation to sell coal of a specified quality, coal from the LH80 properties was not tested for quality prior to execution of the LSF agreement. Commencing with the start of production, LH80 was required to pay the $ 600,000 royalty note and the $ 1,900,000 mine development note at the rate of $ 5.80 per ton for each ton of coal mined and sold. If the terms of the Kenerco and LSF contracts were followed, the notes would be liquidated by December 31, 1990. The Corporation informed Quint that the fair market value of the coal reserves subject to the sublease was in excess of the cash and debt of LH80; *528 that the provisions of the LH80 agreements and notes were fair, equitable, and in accordance with customary business practice in the coal mining industry; and that there was a reasonable expectation the notes would be satisfied out of cash flow generated by mining operations. Quint passed this assurance on to the LH80 investors. On the closing date of June 16, 1980, LH80 paid $ 300,000 to Leah for royalties, $ 250,000 to Kenerco for mine development, $ 2,769.12 for "Printing", and $ 20,955.51 for legal work. LH80 paid off the $ 450,000 mine development note to Kenerco in the latter part of 1980. After the LH80 closing, Quint consented to a proposal by Norman Swanton to have coal extracted from the LH80 properties fractionally allocated to Buffalo Coal (1980). This sharing arrangement is not mentioned in the LH80 offering, and it does not appear that the other partners were formally advised of this development. Production reports for the years 1981 through 1983 show identical tonnages for the two partnerships, although no mining occurred on the Buffalo Coal (1980) property. LH80 paid Kenerco and Kenerco Leasing $ 203,295.55 and $ 551,247.78, respectively, in early 1982 "to properly *529 record the payment of royalty, mining expenses, and long term note and interest expenses for the individual partnerships." Simultaneously, LSF deposited funds allegedly representing "sales proceeds due to the partnerships" in the LH80 bank account to cover the checks. Liberty background
Kevin W. Smith (Smith) was the general partner of Liberty. Smith was also the general partner of the following Swanton coal programs: Wall Street, Bowling Green, Washington, Trinity, Greenwich, and Cortlandt. Smith also acted as an operating manager for PR, a 1977 coal program, and as a consultant for a 1978 coal program. Smith's background in the coal business was limited to his involvement with other Swanton coal programs. From 1972 to 1979 Smith was a vice president of Value Line Securities, a registered investment advisor. During that period he served as a member of the board of directors of an oil and gas company. From late 1979 until mid-1980 he was a financial consultant to certain real estate, nursing home, and movie ventures. In 1980 Smith became president of Arens Petroleum Corp., another Swanton subsidiary. As of June 1980, Smith was responsible for developing the Corporation's *530 "tax incentive programs in oil and gas" as well as organizing several coal programs within the Corporation's investment banking division. None of the programs he was involved in ever made a profit for the investors; no 1979 program met coal production requirements, no 1980 program produced a return of capital, and no 1981 program mined coal. Despite this record, Smith became the general partner of two 1982 programs. Prior to the formation of Liberty, Smith traveled to Kentucky to visit property leased to the Swanton coal programs. He had basic discussions with Kenerco personnel about coal mining, but he did not inspect or investigate the Liberty properties. He did not hire independent consultants to review the reasonableness of the offering agreements. Swanton Securities, Inc. (Swanton Securities), a Swanton affiliate, was the placement agent for Liberty and received a 10-percent sales commission. Smith also sold interests in Liberty, receiving an 8-percent commission from Swanton Securities. He also received a management fee of $ .20 per ton of coal mined and sold by the partnership, as well as annual administrative expenses of approximately $ 15,000. Liberty coal property
*531 Kenerco Leasing obtained the following leasehold rights by agreeing to pay monthly advance royalties (in the range of up to $ 100, except for Lease Nos. 7705, 7905, and 9205) and production royalties (generally the greater of $ 2.00 or 8 percent of the pit price per net ton): Lessor
Lease
Lessee
Date
Term
Eliza Marshall
5305
Ken. Leas.
04/23/81
1 Year
Velma Callahan
7805
Ken. Leas.
10/15/81
1 Year
Claude & Gladys Callahan
7705
Ken. Leas.
10/20/81
1 Year
Garrison/Reid
9205
Ken. Leas.
11/21/81
2 Years
Pleasant and Josie Amis
7905
Ken. Leas.
10/20/81
1 Year
Lucy Sims/Verna Marshall
5905
Kenerco
04/20/81
1 Year
George & Jackie Marshall
6205
Kenerco
04/20/81
1 Year
Before the end of 1981, Kenerco was notified by counsel that Lease Nos. 9205 and 5905 were subject to prior oil and gas leases and had other clouds on title. Nevertheless, Kenerco Leasing purportedly assigned the coal leases to Liberty on December 31, 1981 (the Liberty sublease). [11] Smith did not know whether the leases secured for the Liberty offering were ever recorded. The Corporation guaranteed unconditionally Kenerco Leasing's representations and warranties of title specified in the sublease agreement, *532 which stated that "there are not any other leases or subleases or agreements * * * relating to [the Liberty property] which would have prior right to [Liberty's mining rights]." In mid-1982, Kenerco was notified that Liberty Lease Nos. 7705, 7805, and 7905 were defective, and that "Kenerco and/or Swanton Corporation will have to take a calculated risk if they continue mining in this area." The Corporation informed Smith that due to changes in Kentucky coal mining regulations, Kenerco *533 was required to revise all its permits. Mining operations for Liberty would be delayed for 6 to 12 months until revisions were made. The Corporation did not expect the postponement to "affect the partnership's tax position." Eneco report
The Liberty offering represented that Liberty would sublease property believed to contain "mostly low sulphur * * * high quality steam coal". Late in 1981, Kenerco asked Eneco Resources, Inc. (Eneco), to prepare reserve valuations. Eneco had previously prepared environmental permits for Kenerco. Timothy T. Koch (Koch) was the principal author of the coal reserve report included in the Liberty offering. Koch had never prepared a reserve report or prepared any similar studies. From 1981 to 1984, Eneco prepared more than 25 reserve reports for Kenerco, charging $ 500 to $ 1,500 per report. Kenerco requested that the Eneco report focus solely on the quantity of coal. Koch did no prospecting and did not use the Kentucky Geological Survey; the report was based solely on information supplied by Kenerco. Koch was given a group of properties for each reserve study and was instructed to add as many properties as necessary to obtain a certain *534 coal tonnage. The Liberty reserve report, better characterized as a "resources report", could not be used to develop a mining plan. The report states that there were total recoverable reserves of 1,049,050 tons, assuming a 90-percent recovery rate. Koch prepared a statement to be included in distributed copies of the report indicating that the reserves were inferred, but it was not included in the offering. Although coal quality was not mentioned in the report, the offering stated that "conclusions as to quantity and quality of recoverable coal set forth in the reports are based upon factors which will only be more accurately determined as mining operations proceed." Kenerco also asked Eneco to prepare an estimate of mine development expenses, although Eneco had never done one. Eneco relied on mine development reports prepared in the past by other Kenerco consultants. In preparing the estimate, Eneco considered only the properties included in the reserve study and ignored the fact that Kenerco would be mining adjacent properties. Some of the cost estimates (including costs of new equipment) were supplied by Kenerco. Closing the Liberty program
The Liberty limited partnership *535 offering closed on December 31, 1981. The same type of documents as executed by Quint and the Swanton subsidiaries for LH80 were executed. Kenerco Leasing was the sublessor, Kenerco was the mine developer and contract miner, and LSF was the coal purchaser. Under the sublease agreement, Liberty was required to pay Kenerco Leasing a production royalty of $ 6.50 per ton of coal mined and sold, with a minimum annual royalty of $ 480,000, beginning in 1981. The 1981, 1982, and 1983 minimum annual royalties were each payable by $ 170,000 in cash and by a purportedly recourse note in the amount of $ 310,000 due December 31, 1997. The royalty notes were prepayable out of coal sales revenues. The royalties paid by the coal programs, which were much higher than those received by the land owners, would adversely effect the profitability of the coal programs. Liberty and Kenerco entered into a mine development agreement. Liberty agreed to pay Kenerco $ 3,400,000 for mine development: $ 2,000,000 in 1981 and $ 1,400,000 in 1982. The 1981 payment was to consist of $ 500,000 cash and a $ 1,500,000 note at the time of the closing, payable as to interest only through December 31, 1982. The *536 1982 payment was to consist of cash payments of $ 350,000 and $ 180,000 [12] as well as a $ 970,000 note, payable as to interest only through December 31, 1982. Liberty and Kenerco entered into a contract mining agreement requiring Kenerco to mine and remove a total of 738,000 tons of coal: 28,000 tons in 1983, 58,000 tons each year from 1984 through 1988, and 60,000 tons each year from 1989 through 1995. Liberty agreed to pay $ 20 per ton of coal mined from 1983 through 1985, increasing to $ 31.96 per ton by 1995. The contract terminated once 738,000 tons were mined or when the sublease agreement expired. LSF agreed to purchase 738,000 tons of coal from Liberty with a guaranteed minimum purchase price of $ 40 per ton. The purchase agreement was to continue until 738,000 tons of coal were purchased or until the sublease between Liberty and Kenerco Leasing terminated. Liberty could terminate *537 the contract after 2 years by giving 60 days notice to LSF. Although the coal from the Liberty property was not tested for quality prior to execution of the agreement, LSF had the right to reject coal with a moisture content in excess of 7 percent, an ash content in excess of 14 percent, sulphur in excess of 2 percent, or a caloric value less than 12,000 btu. The price of the coal could be adjusted for ash and caloric value. LSF's obligations were excused in the event of conditions of force majeure upon written notice of the extent and probable duration of the conditions of force majeure. By separate contract, Kenerco agreed to pay LSF $ 40,000 on January 15, 1981, and Kenerco Leasing agreed to pay LSF $ 5 per ton for each ton of coal purchased by LSF pursuant to the terms of the Liberty purchase agreement for a term of 2 years upon commencement of production. On December 31, 1981, Smith paid the $ 170,000 cash royalty to Kenerco Leasing, $ 500,000 to Kenerco for mine development, $ 3,000 to the Corporation for "advance accounting", and $ 1,000 to Kenerco Leasing for "advance". The checks were deposited in the bank on the same date. Mining by Swanton
In 1979, Robert *538 L. Hurd (Hurd) was in charge of the Swanton coal mining subsidiaries. He served on the Corporation's board of directors and was president of Kenerco and LSF, although he had no coal mining experience. Kenerco's books and records (excluding daily records such as payroll accounts) were maintained in New York. Hurd did not have access to Kenerco's bank account and never received any bank statements, and he had little familiarity with or control over Kenerco's finances and records. He had no input into the drafting of the agreements contained in the offering memoranda, and he had nothing to do with the negotiations between the limited partnerships and Kenerco. Hurd received partnership interests in four Swanton coal programs, but he had no choice as to what interest he was to receive. Hurd was listed as an investor to promote the coal programs, and the bonus was declared only to fund his interest in the programs. Hurd hired Gary Dunaway (Dunaway) to be Kenerco's mining foreman in December 1979. In March 1980, Don Perry came to work as a mining engineer; at this time Kenerco did not have master maps identifying the leased coal properties. In its 1981 annual evaluation of Swanton's *539 internal accounting procedures, Touche Ross & Co. noted that "Kenerco Corp. management does not have a complete understanding for some entries which they are told to record by Swanton Corporation." The mining site known as Beach Fork contained the McIntosh and the Mary Moore properties, which were in the LH80 offering, as well as the adjacent Eugene Moore property, which was not in any coal program; coal from the Eugene Moore property was assigned to other coal programs. Dunaway considered the Beach Fork site to be a single mine. This mining operation was designated a "distressed mining operation" by the permit authorizing the mining activity (the Ford Energy permit) when Kenerco acquired it. The permit also listed the Hayes/Gabbard Heirs property. Production under the permit was allocated to one or more of the following coal programs: QPL, ARG (1981), and Bluegrass (1982). Kenerco also obtained Permit No. 095-0092 to mine on the LH80 property. Mining operations subject to this permit were known as either Gabbard Branch or Indian Creek. The Brown Minter, Colson and Rubie Duff, and Hayes/Gabbard Heirs properties were covered by this permit. The Lucy Gabbard property was not *540 listed on any of the foregoing permits, but it was part of mining operations known as Cow Creek. Dunaway's mining plan, such as it was, called for strip mining to begin on the Eugene Moore property and to follow the coal seams into surrounding properties. Dunaway started mining early in 1980 with rough equipment supplied by Kenerco. Dunaway constructed a pond and a 600-700 foot road, basic structures for mining on Beach Fork. The maximum cost of these structures would have been $ 17,000, but no current records were maintained that would show the actual costs. Indeed, during this period, no records were maintained as to what coal program the coal belonged to, and Dunaway did not know which properties were in which coal programs. In mid-1981 Dunaway began mining the Bruce McIntosh property. Mining the entire LH80 tract would have required no more expense than in opening the Eugene Moore tract because the mining plan was to follow the coal seams from one property to another. Hurd had many discussions with Norman Swanton about securing more funding for coal mining. In a June 1981 memorandum, Hurd informed the board of directors that he questioned whether the investments were *541 "sufficient to support the representations that have been made to the investors in the coal programs." Hurd left the Corporation in 1981. Daniel E. Lebo (Lebo), who had some mining experience, succeeded Hurd as Kenerco's president. He discovered that the company lacked sufficient mining equipment and that many key staff members were not qualified for their positions. He was not aware that many of the Swanton coal programs had contracts with Kenerco, though Kenerco was obligated to develop coal properties and mine coal. He was not aware that the programs were required to sell coal to LSF; he thought that the coal was sold directly to the end user or a broker and that the assignment of coal to the various coal programs was handled in New York. Lebo resigned in February 1983. At that time Kenerco owned only two spreads of mining equipment though it was obligated, as of January 31, 1982, to mine and sell 20,095,000 tons of coal. In April or May of 1981, Frank Ittel (Ittel), a coal wholesaler and broker with experience in the southeastern Kentucky coal region, became associated with Kenerco. There were two Kenerco mines that were producing at most a total of 10,000 tons a month: *542 Beach Fork, in Owsley County, which employed 16 or 18 people; and Pine Creek, in Laurel County, which was apparently mined by contract miners. Kenerco's Lexington, Kentucky, office employed between 10 to 15 people. In Ittel's opinion the Lexington overhead, particularly in the accounting department, was out of proportion to coal production. Kenerco mined low-grade steam coal, which, mixed with other coal secured on the open market, was loaded in Kentucky at approximately $ 26 per ton. The coal had a price of about $ 20 a ton "at the mine mouth." Although Kenerco claimed that it had between 50 million and 70 million tons of coal reserves, Ittel maintained that only the Owsley County properties could possibly support a mining operation and that the quality of that coal was questionable. He concluded that "Swanton and Kenerco were more concerned with selling coal shelter programs than they are in developing commercially feasible and profitable coal mines." Ittel lasted only about 8 months with the Swanton coal operation. In February 1982, the Corporation informed the LH80 investors that the "spot market prices in eastern Kentucky and generally throughout the U.S. declined precipitously *543 during the past winter" and discontinued mining in the Beach Fork area. Although mining operations did not change during late 1982 or early 1983, Kenerco began instructing Dunaway to assign truckloads of coal from the mine to various coal programs. In spite of its problems the Corporation continued to sponsor coal programs. In August 1982, Swanton Securities was promoting coal programs as "money machines", promising "$ 20,000 invested, an after tax set off of $ 35,000 for a net cash gain of $ 15,000." With respect to liability for the purportedly recourse notes, Swanton Securities stated that although investors were at risk from a legal standpoint, "it is not true from an economic standpoint"; the programs were backed by the Corporation's performance guarantee, the notes were not due until 1997, and the notes were "non-assignable" and non-transferrable. If the "very worst" happened and Swanton or its subsidiary defaulted, Swanton Securities suggested that the Corporation would not enforce the notes and "profit by its own breach of contract". Kenerco was not profitable in 1983 and relied on the Corporation for operating funds. Dell Adams (Adams) succeeded Lebo as president of *544 Kenerco in July 1983, and he was aware of the fact that new programs were formed in late 1983. Adams named Richard Rouse (Rouse) to be vice president in late 1983. The flow of funds to Kenerco stopped in early 1984; Norman Swanton told Adams that funds simply were not available. Adams left over a dispute with the Corporation over compliance with Securities and Exchange Commission regulations. Rouse succeeded Adams as president of Kenerco, reporting to Mel Gardner (Gardner) in the Corporation's New York office. In November 1984, Rouse prepared a memorandum for Gardner in which he listed all the coal programs, the tonnages required to be mined, the tonnages mined to date, and recommendations that certain leases be dropped. Generally, he recommended dropping most of the Owsley County leases. He recommended dropping some of the LH80 leases because the "Assigned properties * * * [have] no coal, unmineable or unmerchantable coal." He recommended dropping all of the Liberty leases because the properties had "very thin coal where coal is present." Of the 1979 programs, while the memorandum states that some coal had been mined for the programs, the properties were not assigned to any *545 program. Of the 1980 programs, only Buffalo and LH80 were allocated any coal. None of the 1981 programs mined coal. Rouse discussed the memorandum with Norman Swanton and Gardner, who instructed him to destroy it or lock it up. Although none of the 1979 or 1980 programs were mining, Rouse had no discussions with the general partners concerning the partnership funds. The mine development account
Prior to 1983, the Internal Revenue Service began questioning various aspects of the Swanton coal programs, particularly the mine development accounts. Deepak Gluati (Gluati), administrative assistant to Norman Swanton, hired Thomas Roberts (Roberts) to prepare a mine development report. Gluati gave specific instructions as to what the report should include. Roberts prepared a summary of development costs for the 1980 programs, from February 1980 to January 1984, showing estimates of $ 23,600,000, of which only $ 11,259,566.25 was actually spent for mine development. LH80 mine development had been estimated at $ 2,600,000, but the summary showed that $ 2,509,004.82 was spent. These figures were submitted to the Internal Revenue Service. The summaries allocated the general *546 and administrative expenses of both the Corporation's New York operations and Kenerco's Lexington operations among the programs, designating them as mine development costs. Swanton's operational expenses included amounts paid that clearly had no connection to mine development: Expenses relating to the purchase of a subsidiary, amounts paid to the New York Athletic Club, amounts paid for parking fees, amounts paid for unrelated travel and entertainment, amounts paid for accounting fees for a subsidiary not involved in coal mining, amounts paid for bonuses for officers, amounts paid for real estate ventures, and credit card fees incurred by Norman Swanton's wife. Other amounts in the mine development account, although related to mining, were not mine development expenses: Royalty payments, State taxes, reclamation costs, black lung taxes, and contract miner expenses. Kenerco's mine development expenses for Liberty were similarly prepared even though Smith never saw a mining plan for Liberty. Termination of coal programs
On April 15, 1985, the Corporation, Kenerco, LSF, and Kenerco Sales filed petitions under chapter 11 of the Bankruptcy Code. During the proceedings, investors *547 in the programs disputed the enforceability of the notes, asserting as defenses lack of performance and offset by reason of liquidated damages. Two coal programs obtained separate judgments against the Corporation, Kenerco Leasing, and Kenerco in July 1985. Kenerco Leasing waived its right to claim default resulting from LH80's failure to pay interest through December 31, 1980, on both the mine development and royalty notes, and with respect to the minimum annual royalty installments. In April 1986, investors were offered a settlement releasing them from 97.5 percent of the liability. Quint signed the note settlement agreement on behalf of LH80 on April 8, 1986, and Smith signed the note settlement agreement for Liberty on April 16, 1986. The agreements were approved by the Bankruptcy Court. The LH80 and Liberty royalty and mine development notes were cancelled on December 31, 1986, and the releases were delivered to the Corporation. The disputed tax returns
LH80, an accrual basis partnership, filed Form 1065, U.S. Partnership Return, for each of the taxable years 1980 through 1982: Net
Mine
Chapins'
Income
Loss
Royalty
Development
Distributive
Year
Reported
Reported
Deduction
Expenses
Share of Loss
1980
- 0 -
($ 3,647,726)
$ 900,000
$ 2,600,000
($ 182,386)
1981
$ 1,406,219
(354,166)
900,000
602,665
[1] (1,850)
1982
588,003
(563,998)
900,000
252,001
- 0 -
*548 On its 1980 return, LH80 deducted $ 134,720 accrued interest and $ 11,839 legal and accounting expenses. On its 1981 return, LH80 deducted $ 245,500 accrued interest, $ 8,035 operator fees, and $ 2,229 professional fees. On its 1982 return, LH80 deducted $ 239,119 accrued interest, $ 3,360 operator fees, and $ 2,945 professional fees. Liberty, an accrual basis partnership, filed Form 1065, U.S. Partnership Return, for each of the taxable years 1981 through 1984: Net
Mine
Kelleys'
Coal
Loss
Royalty
Development
Distributive
Year
Income
Reported
Deduction
Expenses
Share of Loss
1981
- 0 -
($ 2,507,392)
$ 480,000
$ 2,000,000
($ 71,636)
1982
- 0 -
(2,085,413)
480,000
1,400,000
(59,581)
1983
$ 647
(769,184)
480,000
- 0 -
(21,976)
1984
- 0 -
(797,400)
480,000
- 0 -
(22,782)
For 1981, Liberty deducted $ 27,192 in professional fees. On its 1982 return, Liberty deducted $ 191,700 for accrued interest and $ 11,313 for legal and accounting expenses. On its 1983 return, Liberty deducted $ 285,075 for accrued interest and $ 2,356 for legal, accounting, and miscellaneous expenses. On its 1984 return, Liberty deducted $ 306,000 for accrued interest, $ *549 7,000 for guaranteed payments to Smith, and $ 2,000 for legal and accounting expenses. The $ 647 of coal income reported in 1983 was either dividend or interest income. Respondent disallowed the deductions claimed by petitioners on their respective Federal income tax returns. OPINION A. General Principles
The Internal Revenue Code contains several provisions that benefit bona fide mining operations. For example, section 616(a) generally allows a current deduction for "all expenditures paid or incurred during the taxable year for the development of a mine". Royalty costs are deductible by the payor as a trade or business expense similar to rental payments under section 162(a)(3). See . The current deductions arising from advanced minimum royalties and mine development expenses are attractive for sheltering income. The threshold issue, however, is whether the partnerships were organized and operated with the objective of making a profit. If not, no deductions under section 162 (ordinary and necessary business expenses), 616(a) (mine development), or 165(c)(1) or (2) (business or transaction *550 losses) are allowable. See ; , affd. . Petitioners argue that they may deduct the claimed losses because the partnerships were bona fide coal mining ventures. Respondent maintains that Liberty and LH80 are examples of the classic tax shelter, designed to generate large tax deductions rather than economic gain. [13]
With certain exceptions, a partnership computes income "in the same manner as in the case of an individual". Sec. 703(a). See also . *551 In order for a partnership to claim deductions for expenses, the activity must be organized and operated with the dominant hope of realizing a profit. . While a reasonable expectation of profit is not required, the hope of deriving a profit must be bona fide. , affd. without published opinion . The profit objective must be primary and predominant. As used in this context, "primary" means "of first importance" or "principally". ; , affg. ; ; . This Court has described the requisite profit objective in terms of a "basic," "dominant," "realistic," and "substantial" goal. , *552 affd. without opinion ; . "Profit" means economic profit, independent of tax savings. . Whether a profit objective exists is a question of fact to be resolved based on all of the evidence. ; . It is to be resolved not on the basis of any single factor, but in light of all facts and circumstances. . The absence of a particular indication of profit motive may be more significant to our decision than the superficial presence of another indication. . The primary focus is on the contemporaneous facts and circumstances, not a hindsight analysis of events. , affd. . *553 Our inquiry should concentrate on what was reasonable to believe in 1980 and 1981, not which expert was correct in 1992. , affg. , cert. denied . In cases dealing with deductions for the expenses of partnerships, the analysis of the profit objective begins at the partnership level. ; ; , affd. ; see also ; , affd. on this issue without published opinion . In determining the intent of the partnership, we examine the actions of the promoters and general partners, as these individuals effectively organize and *554 operate the partnerships. . We focus on their intent, knowledge, conduct, expertise, and all other factors they relied upon in making decisions for the partnership. . Little significance is accorded the limited partners' intent, as they have no control over partnership activities. . "While the intentions and objectives of the limited partners may have some relevance, the partnership itself is the entity that * * * must prove that it is entitled to the deduction". . In looking at the objectives of the partnership, "those parties possessing resources sufficient to acquire and exploit investment property are not always blessed with corresponding expertise"; a partnership can rely upon the expertise of third parties by contractually assigning duties and responsibilities. . The prudence that the partnership exercises in acquiring property *555 and in assigning duties to third parties, and the care with which it oversees the performance of such duties, are of heightened importance. The formation and operation of the Swanton coal programs appear to have as substance little more than a grandiose serving of whimsy. It is not our goal to list all of the foibles in the programs, but there are several salient areas that simply defy rational explanation. B. The Swanton Coal Programs Examined
1. Expertise of the dramatis personae.
One of the basic considerations in determining whether a partnership has a profit objective is whether the promoters and principals had the expertise to conduct the activity profitably. See ; ; . None of the Swanton management in New York had any coal mining experience. Norman Swanton and Eugene Scalercio exhibited an unfamilarity with coal mine technology and operation. Quint and Smith, the general partners, were similarly unencumbered by any meaningful coal mining experience. *556 [14] On the other hand, all of the principals were well versed in the formations and marketing of leveraged tax shelters. The people with coal mining experience, i.e., Dunaway and Lebo, had no voice in management or were kept in the dark regarding the coal programs. The one person with the most industry experience, Ittel, lasted with the operation 8 months before he quit in disgust. The New York offices ignored any advice from the field regarding coal mining operations. Although Smith and Quint indicate that they had discussions with the Kentucky mine operators, the latter do not recall any significant discussions. 2. The coal properties.
The courts have also considered, *557 in looking for a profit objective in mining operations, whether there was exploration of the property adequate to justify operations. E.g., ; . See also However, there were so many assignments of the various interests in the properties that it is impossible to determine with certainty what property belonged to which partnerships. Nevertheless, the reports prepared are revealing in showing the care and concern that the general partners exercised. The Geological Associates and Eneco reports were clearly inadequate as a basis for mining operations. The preparers had no experience in estimating coal reserves and did no on site inspection on the properties. Furthermore, the reports do not mention the quality of the coal. The most that can be said about the reports is that they are guesses at what the inferred reserves may have been. Quint and Smith never questioned the scriveners of these reports as to the preparation or reliability of the reports. If they had made even the *558 most perfunctory inquiry, they would have found that neither author intended the reports to be used as they were. It is not even clear whether Smith and Quint knew what properties allegedly were assigned to the partnerships of which they were the general partners. Based on these reports, no prudent investor would have committed the funds that Quint and Smith purportedly did. 3. The terms of the partnership agreements.
An indication of a profit objective is the reasonableness of the terms of any agreements entered into by parties in the activity, particularly when those terms also define the purported tax benefits. See . One can understand how an entity that puts together various leases for a program could reasonably expect to benefit from its efforts, but what is not comprehensible is how a partnership could expect to mine coal profitably when it pays royalties high above prevailing rates. This did not seem to bother either Quint or Smith, and they never questioned the arrangements. [15] We conclude that phenomenal increases in royalties "may be described as magical", and that they were simply a means *559 of inflating tax deductions. See ; cf. The mine development costs are another area of concern; it is unclear where the LH80 and Liberty figures came from. Even petitioners' expert, upon whom we place little confidence because, inter alia, of his lack of knowledge of the area, had difficulty justifying the estimated costs. Respondent's experts were even less enthusiastic. Norman Swanton had significant influence over the estimation process though he had absolutely no experience in or qualification for such activity. We note that in opening the Beach Fork mine Dunaway spent a maximum of $ 17,000 and that Lebo considered the stated mine development expenses to be some *560 10 times higher than they should have been. While the disparity in these figures and the stated estimates are disquieting, the fact that the general partners apparently never questioned the figures nor sought advice from people with experience in the field is fatal. There are other parts of the agreements that suggest these partnerships were designed primarily, if not exclusively, for tax benefits: The artificial coal prices (even if reasonable, the prices were not based on a known quality of coal); the circular liability of the purportedly recourse notes; and the failure of the agreements to take into account any terrain differentials. We see no reason to explore further the partnership agreements; we do note, however, that there is little, if anything, in the agreements to support petitioners' arguments. C. Swanton's Coal Mining Operations and the Partnerships
Not only were the agreements artificial, but so were the Corporation's coal mining operations. Norman Swanton testified that approximately $ 38,000,000 was raised by selling the shelters. [16] Ittel characterized the Corporation as being "more concerned with selling coal shelter programs than * * * developing commercially *561 feasible and profitable coal mines"; and Ittel's knowledge of the inner workings of the New York headquarters was scant. [17] The Kentucky operations were simply window dressing for what is best described as a coal mining Ponzi scheme. Funds that were earmarked for mining actually went to New York; little trickled back to Kentucky. When Dunaway began mining the Beach Fork property, no records were maintained to show which coal was mined for which partnership. *562 The equipment was insufficient for mining the programs for which Kenerco was obligated, and what equipment was available was "rough." The Kentucky operations enjoyed a succession of presidents who left after learning that coal mining was not a priority. By the end of 1981, the Corporation and its subsidiaries were purportedly obligated to mine and sell over 20 million tons of coal, and yet during that year monthly production averaged 10,000 tons. The coal that was mined was not easily marketable; it had a value of approximately $ 20 per ton at the pit, and yet LSF was supposedly paying the partnerships $ 35 to $ 40 per ton. It is not surprising that production at Beach Fork ceased in early 1982. Each mine development agreement required completion by a certain date (December 30, 1980, for LH80 and June 30, 1983, for Liberty), and the contracts provided for liquidated damages of $ 1,000 per day. The mines were never developed, much less mined, but the general partners never invoked the damage clauses. [18]
*563 The clearest indication of the true nature of the Swanton coal programs is contained in the so-called mine development account prepared by the Corporation. One witness, who analyzed the account, observed: I've been examining coal returns in eastern Kentucky since 1979, and * * * [this is] the first time I've ever seen a squash instruction [paid to the Downtown Athletic Club in New York] claimed as a mine development cost to develop coal property to produce coal.
We have listed some of the other peculiarities of that account in the findings of fact, and they need not be repeated here. From our analysis of the account, we are convinced that the Corporation had a profit motive, but the profit depended on the marketing of bogus coal shelters, not on mining coal. It was estimated at the time that $ 7 of every $ 10 raised went to the Corporation's coffers. It is quite clear that the Swanton coal programs, from start to finish, were nothing more that an elaborate scam to provide highly leveraged deductions for nonexistent expenses. [19]
*564 Petitioners argue that even with outrageously inflated royalties, mine development expenses, and other costs, the partnerships could have made a profit. If the price of coal tripled or quadrupled, this may have been possible. But the mere possibility of profit does not explain why supposedly intelligent participants would agree to be gouged by these inflated prices. Furthermore, this assumes the properties had marketable coal reserves and that the Corporation had mining capabilities, assumptions which are, to say the least, farfetched. Petitioners also contend that their position is similar to that of the taxpayers in . In that case we found a reasonable possibility that the mining operation could turn a profit and that the taxpayers worked hard to realize that goal; moreover, the taxpayers properly investigated the properties and consulted with experts in the field. To say that the Swanton operations are similar is to cut a purse from a sow's ear. "The record [here] is far more susceptible to the interpretation that whatever activities were conducted were intended to give some semblance of economic *565 substance to a venture whose promoter and participants fully anticipated eventually to find themselves before this Court." . D. Miscellanea
Since we find that the Swanton coal programs were not activities entered into for profit, discussion of respondent's other arguments concerning the deductions claimed is unnecessary. Our finding that the partnerships were not engaged in a trade or business for profit disposes of the issues concerning deductibility of expenses under sections 162, 165(c), and 616(a); however, petitioners allege that a part of the losses claimed resulted from interest paid on the notes executed. We agree that even if the transactions were not entered into for profit, interest may still be deductible under section 163 if it flows from a bona fide debt. See , affg. in part and revg. in part . But the question remains whether there is a bona fide debt. , *566 affg. . Bona fide indebtedness is an existing, unconditional, and legally enforceable obligation to pay money. , affd. , cert. denied . "[A] Court must look to the substance of the transaction, not the formalities surrounding it." . Based on the record, we are convinced that the so-called recourse notes entered into by these partnerships were not unconditional obligations for the payment of money. See et seq. (1986), affd. , and cases cited therein. Although characterized as recourse, the notes were subject to the offsets for failure to comply with the agreements and the performance assurances by the Corporation. The fact that the partners made nominal payment on the notes is not conclusive. While there are very few statements that emanated from the Corporation *567 and its subsidiaries that ring true, Swanton Securities' statement that the investors were not at risk "from an economic standpoint" is an exception, and we think that the statement reflects the true state of affairs. [20]
E. Section 6621(c) and Additions to Tax for Negligence
Section 6621(c) provides that where there is a "substantial underpayment attributable to tax motivated transactions, the annual rate of interest * * * shall be 120 percent" of the normal rate. Sec. 6621(c)(1). A substantial underpayment is an underpayment exceeding $ 1,000. Sec. 6621(c)(2). "Tax motivated transactions" include, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). We have consistently held that transactions devoid of profit objective and economic substance are shams *568 within the meaning of section 6621(c)(3)(A)(v). , and cases cited therein. The Swanton coal programs fall within the definition of tax motivated transactions, and to the extent the underpayments exceed $ 1,000, petitioners are liable for the increased rate of interest. The tax code imposes additions to tax if any part of the underpayment of tax is due to negligence or intentional disregard of the rules and regulations. [21] "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." , cert. denied ; . The question then is whether petitioners Chapin and Kelley used ordinary care and prudence when they invested in the Swanton coal programs and when they subsequently reported losses from those programs.
*569 Both Chapin and Kelley admit that they had no expertise in coal mining; both, however, had extensive business and investment backgrounds. They knew that the perceived tax advantages, when compared with their out-of-pocket payments, were enormous. They simply accepted the packaged shelter programs with little more than the assurances of Norman Swanton and the general partners, all of whom stood to profit by their investments and none of whom had any real coal mining experience. In these circumstances, further investigation was mandated. Petitioners, however, contend that they relied on their professional tax advisers. While reliance on expert or professional advice may satisfy the reasonable prudent person standard, that reliance must be reasonable. , affd. , affd. on another issue . There is nothing in the record to indicate that the advisers had any expertise in coal mining. Given the fact that significant proportions of the deductions claimed emanate from the outrageous royalty *570 and mine development expenses, a prudent person would have surely investigated further. Respondent's determinations of the additions to tax for negligence are sustained. [22]
Decisions will be entered for respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Harold Chapin and Lila Chapin, docket No. 37857-86; Eugene and Barbara Kelley, docket No. 33957-87.↩
2. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Smith v. Commissioner, docket No. 10171-86; Benatovich v. Commissioner↩, docket No. 10172-86; see .
1. 50 percent of the interest due on portions attributable to negligence.↩
1. 50 percent of the interest due on portions attributable to negligence.↩
4. The coal programs other than LH80 and Liberty were: 1977: TGN, PR, APC, WJT, JSM, and DMH. 1978: QPL and Darnell. 1979: Wall Street, ARG, Buffalo Coal, Coal Duck, Lighthouse Hill, and Niagara Frontier. 1980: Buffalo Coal, ARG, Bowling Green, Coal Duck, Niagara Frontier, Rochester Coal, and Washington. 1981: ARG, Harbor, Los Altos, Buffalo Coal, Trinity, Lake Erie, and Saltwell. 1982: Cranford, Empire Coal, Greenwich, Bluegrass, Pacific Energy, Manhattan, Lincoln, Cortlandt, Golden Gate, and California Coal. 1983: Salt Lake, Utah Coal, Palm Canyon, Wilshire West, Century Coal, and Lexington. 1984: Ohio Coal, Sierra, Cumberland-84, and Redwood. Most of the names are followed by the word "Associates", e.g., Lighthouse Hill Associates.↩
5. While T.C. Bell appears on contracts as a mine developer or miner, the parties have stipulated that "T.C. Bell was merged 'de facto' into Kenerco." Accordingly, we do not differentiate between T.C. Bell and Kenerco.↩
6. Quint was also the general partner of the following Swanton coal programs: Lighthouse Hill (1979), Buffalo Coal (1979), Niagara Frontier (1979), Niagara Frontier (1980), Buffalo Coal (1980), and Rochester Coal (1980).↩
7. While Quint testified that he inspected the LH80 property prior to closing, that he employed an outside mining engineer to investigate the coal reserves, and that an engineering report was prepared, we find his testimony of dubious value. The report was "lost", Quint could not remember the name of the mining engineer, and he could not recall when he inspected the property.↩
8. It is by no means clear from the Corporation's records which coal programs had an interest in these properties. According to ledger sheets maintained by the Corporation (Joint Exhibit 801-ADS), the properties were assigned to LH80. Part of the Brown Minter property was also subleased to Buffalo Coal (1980). Coal produced on many of the LH80 properties was "assigned" to other Swanton coal programs, although the sublease agreements were not modified subsequent to the offering. Coal produced on the Joel McIntosh property between November 1981 and September 1982, as well as the production royalties earned, was divided between the 1979 coal programs Niagara Frontier and Wall Street. Coal produced by the Bruce McIntosh property was also allocated to Niagara Frontier and Wall Street as well as to Buffalo Coal (1980). Production from the Marvin McIntosh and Mary Moore properties was assigned to ARG (1979), ARG (1980), and Buffalo Coal (1980). Half of the production from the Bernie and Verna Gabbard lease was assigned to Buffalo Coal (1980). Coal production and the cost of royalty payments to the property owners from the following properties, although sublet to other coal programs, were partially allocated or reported for accounting purposes to LH80 (as well as to Wall Street (1979) and Niagara Frontier (1979)): Indian Head Energy (Lease no. 3605), Charlie and Etta Bell McIntosh (Lease no. 3705), Larry and Peggy Pierson (Lease nos. 7505 & 7605), and Eugene Moore (Lease no. 2505). Kenerco's interoffice memoranda suggest that Lease no. 4805 (name not listed) and Lease no. 3905 (W. and M. Marshall) were assigned to LH80 prior to 1984, but these properties were not part of the LH80 sublease as of the offering date.↩
9. Inferred reserves have the lowest degree of confidence rated by the U.S. Geological Survey and the U.S. Bureau of Mines (for a description of coal reserve nomenclature see . Inferred reserves are general quantitative estimates based on the geologic character of the region.↩
10. Norman Swanton and Quint testified they contemplated mine development to continue over the life of the mine, and that the clause requiring the completion of mine development by December 31, 1980, was a "drafting problem". They relied on a sentence in the LH80 offering stating that only the initial work was required to be completed by December 31, 1980. The next sentence, however, provides that "The Mine Developer is required to complete all work by December 31, 1980."↩
11. According to a "Property Status Log", of the 217,765 tons of coal to be extracted from the Garrison/Reid tract, half was to be "allocated" to Harbor, a 1981 coal program. This allocation was not mentioned in the offering, and there is nothing in the record indicating that Liberty investors authorized it. Moreover, this property was also purportedly subleased to Harbor. According to Joint Exhibit 801-ADS, Lease No. 5805 (Jerry and June Marshall) was also "assigned" to Liberty, although this lease is not part of the Liberty sublease.↩
12. The $ 180,000 figure appears to be an error in the drafting of the document and should be $ 80,000 according to the offering.↩
1. The Chapins reported a distribution recapture in the amount of $ 2,258, which when offset by the claimed loss, resulted in income of $ 408.↩
13. Respondent has not argued that the lack of a profit objective disqualifies LH80 and Liberty as partnerships for Federal income tax purposes. See , affd. .↩
14. We flatly reject petitioners' contention that Smith and Quint acquired experience in the coal mining area through their participation in previous Swanton programs. As far as the record shows, none of these ventures ever mined any coal. The experience that Smith and Quint acquired relates to marketing coal shelters, not to coal mining.↩
15. Both Quint and Smith indicated that they negotiated the terms of these contracts. Given the fact that most, if not all, of the partnerships have virtually identical terms, we believe this to be highly unlikely.↩
16. It appears, however, from the amounts deposited in Kenerco's account with Chemical Bank, that the figure was closer to $ 44 million.↩
17. We have grave doubts that Smith and Quint were, as they testified, misled by Norman Swanton. Both had significant relationships with the Corporation, as either an employee or as a shareholder, and both functioned as general partners in partnerships formed before and after the partnerships before the Court. Both appear to be reasonably intelligent individuals, and their disclaimer of knowledge has a decidedly hollow ring.↩
18. Although Smith and Quint both testified that they had frequent discussions with Norman Swanton concerning coal production, there is little or no documentation of these exchanges.↩
19. Both parties devoted significant energy defending their experts and attacking the opposing experts. While we believe respondent's experts were better armed, we see no reason to enter into this fray. Both experts assume a basic fact that simply did not exist, and that fact was that the Corporation had the capability and intent to mine coal.↩
20. We note with some bemusement that when Jack Hunt, an investor in LH80, complained about the potential liability, he was released from liability by Norman Swanton and ultimately his interest in LH80 was assigned to the Corporation.↩
21. For the taxable years 1979 and 1980, sec. 6653(a) provided the addition; amendments to the Code placed the addition, as well as an addition to the interest, in sec. 6653(a)(1) and (2) for the taxable year 1981.↩
22. Respondent also determined an addition to tax against the Chapins for the taxable year 1981 under sec. 6659 and additions to tax against the Kelleys for the taxable years 1981 and 1982 under sec. 6651(a)(1). The parties have not mentioned these in their briefs, and we assume that petitioners concede these issues.↩