**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES G. FARGO; ELIZABETH A.
FARGO,
            *Petitioners-Appellants,*

            v.

COMMISSIONER OF INTERNAL
REVENUE,
            *Respondent-Appellee.*

No. 04-72190

D.C. No.
Tax Ct. No.
9492-02L

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
December 5, 2005—Pasadena, California

Filed May 8, 2006

Before: Robert R. Beezer, Cynthia Holcomb Hall, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Hall

**COUNSEL**

Dennis N. Brager, Law Offices of Dennis N. Brager, Los Angeles, California, for the appellants.

Randolph L. Hutter, Tax Division, United States Department of Justice, Washington, D.C., for the appellee.

Terri A. Merriam, Pearson Merriam, Seattle, Washington, for the amici.

**OPINION**

HALL, Senior Circuit Judge:

Charles and Elizabeth Fargo (Taxpayers) appeal the decision of the Tax Court holding that the Commissioner of Internal Revenue did not abuse his discretion by rejecting their offer to pay $7,500 in compromise of the approximately $104,000 interest owed on their 1983 and 1984 federal income tax liabilities. We affirm.

## I. Facts

More than twenty years ago, Taxpayers bought interests in two partnerships: the Jackson & Associates Partnership (Jackson), and the Smith & Asher Associates Partnership (Smith &

Asher). In 1983, Taxpayers claimed a loss of $30,767 attributable to their interest in Jackson; in 1984, they claimed a $2,749 loss from Jackson and a $28,996 loss from Smith & Asher. These partnerships were themselves partners in yet other partnerships (Wilshire West Associates and Redwood Associates, respectively), which in turn were associated with a series of tax shelters called the Swanton Coal Programs.[1] All of the partnerships were subject to the Tax Equity and Fiscal Responsibility Act (TEFRA) provisions of 26 U.S.C. §§ 6221-6234.

The Swanton Coal Programs were exposed as purely tax-motivated transactions in *Kelley v. Commissioner of Internal Revenue*, 66 T.C.M. (CCH) 1132 (1993), with the Tax Court opining that the Programs were "nothing more than an elaborate scam to provide highly leveraged deductions for nonexistent expenses." The Tax Court's 1993 ruling in *Kelley* had an effect on Taxpayers' liabilities for 1983 and 1984, but the final liability amount would not be determined until six years later, in 1999. This delay stemmed from the tiered partnership system: before the effect of the decision in *Kelley* could be determined, the Commissioner had to negotiate with the Tax Matter Partners (TMPs) for Jackson and Smith & Asher. The delay led to an accumulation of penalties and interest that increased Taxpayers' total liability to over $127,000. After the assessment was finalized in 1999, Taxpayers were informed of their liability—and while they quickly paid their back taxes (in the amount of $23,977), they refused to pay the remaining interest ($104,287.91). The Commissioner sent notice of intent to levy, and Taxpayers requested a Collection Due Process hearing before the Office of Appeals.

Taxpayers timely submitted to the Appeals Officer an offer-in-compromise for $7,500 (about seven percent of their

---

[1]For a more detailed description of the relevant partnerships and of the Swanton Coal Tax Shelters, see *Fargo v. Comm'r*, 87 T.C.M. (CCH) 815 (2004), and *Kelley v. Comm'r*, 66 T.C.M. (CCH) 1132 (1993).

outstanding liability). At the time of the offer, temporary Treasury Regulations issued pursuant to 26 U.S.C. § 7122 governed the acceptance of offers-in-compromise.[2] Temporary Treasury Regulation § 301.7122-1T(b)(4) indicated that

> a compromise may be entered into to promote effective tax administration when—

>> (i) Collection of the full liability will create economic hardship within the meaning of § 301.6343-1; or

>> (ii) Regardless of the taxpayer's financial circumstances, exceptional circumstances exist such that collection of the full liability will be detrimental to voluntary compliance by taxpayers; and

>> (iii) Compromise of the liability will not undermine compliance by taxpayers with the tax laws.

Taxpayers' offer-in-compromise was based on sections (i) and (ii) of this regulation; they claimed both economic hardship and exceptional circumstances. They argued that economic hardship would ensue because Mr. Fargo's medical expenses would soon balloon to $90,000 per year, and the large interest payout of $104,000 would both cut into their overall resources and eventually serve to bankrupt them. Taxpayers additionally claimed exceptional circumstances, arguing that the IRS dragged its feet in determining their liability, and thus the delay was not Taxpayers' fault and should not be held against them. Also under the "exceptional circum-

---

[2]The applicable temporary regulation, § 301.7122-1T(b)(4), can be found at 64 Fed. Reg. 39,020 (July 21, 1999). The final regulation, codified at 26 C.F.R. § 301.7122-1, is substantially identical, but does not apply here. *See Fargo*, 87 T.C.M. 815 at n.2.

stances" rubric, Taxpayers contended that Congress specifically contemplated longstanding cases such as theirs when it enacted 26 U.S.C. § 7122, and all but required that such cases be compromised.

The Commissioner rejected their offer. The Tax Court, reviewing for abuse of discretion, affirmed. *Fargo v. Comm'r*, 87 T.C.M. (CCH) 815 (2004). Taxpayers appeal, again arguing economic hardship and exceptional circumstances.

## II.    Standard of Review

We review the Tax Court's decision under the same standard as civil bench trials in district court, *see Milenbach v. Comm'r*, 318 F.3d 924, 930 (9th Cir. 2003), and thus review de novo. *Boyd Gaming Corp. v. Comm'r*, 177 F.3d 1096, 1098 (9th Cir. 1999). In this instance, de novo review amounts to a fresh analysis of whether the Commissioner abused his discretion. Abuse of discretion occurs when a decision is based "on an erroneous view of the law or a clearly erroneous assessment of the facts." *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997) (en banc) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)).

## III.    Discussion

*A.    Economic Hardship*

The Tax Court held that the Commissioner did not abuse his discretion in determining that the Taxpayers would not experience economic hardship if their offer-in-compromise was rejected. We agree.

[1] The operative statutory and regulatory framework in this case focuses on basic expenses. The regulation in effect at the time of the offer-in-compromise, Temporary Treasury Regulation § 301.7122-1T(b), provides that a compromise "may be entered into to promote effective tax administration

when . . . [c]ollection of the full liability will create economic hardship within the meaning of § 301.6343-1." Economic hardship is defined as the inability of the taxpayer "to pay his or her reasonable basic living expenses." 26 C.F.R. § 301.6343-1(b)(4)(i). The regulation goes on to specify that:

> The determination of a reasonable amount for basic living expense will be made by the director and will vary according to the unique circumstances of the individual taxpayer. Unique circumstances, however, do not include the maintenance of an affluent or luxurious standard of living.

*Id*. These regulations are consistent with provisions of their authorizing statute, 26 U.S.C. § 7122, which provides explicitly for a case-by-case analysis "designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses." 26 U.S.C. § 7122(c)(2).

**[2]** Taxpayers claim that they will suffer economic hardship if they are required to pay their full $104,000 liability. They argue that Mr. Fargo's medical expenses, owing to his progressive dementia, will soon reach $90,000 per year and bankrupt them in about a decade. The evidence to support their claim is thin. First, the only medical evidence Taxpayers present is a diagnosis performed by a clinical neuropsychologist that indicates that Mr. Fargo suffers from Frontal Lobe Dementia, contributing to a number of impairments of his mental abilities. This diagnosis, however, mentions nothing of the necessity for long-term around-the-clock nursing care, nor of medical expenses.

**[3]** Second, the Taxpayers' current monthly medical expenses, as reported in the Monthly Income and Expense Analysis section of their offer-in-compromise, total $288. Their claimed future expenses of $90,000 per year seems predominantly hypothesized from publicly-available information

that is not particularized to Mr. Fargo. Thus, their future medical expenses are almost wholly speculative.

**[4]** Third and perhaps most importantly, Taxpayers have considerable assets, and it is highly unlikely that their ability to pay "basic living expenses" would be impaired even were Mr. Fargo to require around-the-clock nursing care. Taxpayers have an annual adjusted gross income of $144,378; bank accounts and individual retirement accounts worth $126,179; securities worth $594,628; and equity in real property amounting to $309,000. Their non-income assets are worth more than a million dollars combined. Furthermore, their current reported expenses are $5,888 per month, against a monthly gross income of $8,859. In other words, Taxpayers can afford significantly greater health care expenses than they currently pay, even without liquidating any assets. Accordingly, their contention that their medical expenses will outrun their net worth in ten years seems to assume a number of premises unsupported by the record, and indeed feels like nothing more than back-of-the-napkin multiplication.

**[5]** Taxpayers' hardship claim is particularly weak given that the relevant inquiry is only whether the Commissioner abused his discretion. Although one might find some ground upon which to quibble with the Commissioner's decision, it is impossible to hold that the Commissioner employed an erroneous view of the law or a clearly erroneous assessment of the facts. Given the speculative nature of Taxpayers' expenses, their considerable accumulation of wealth, and the statutory focus on basic expenses, it stretches reason to contend that the Commissioner abused his discretion in rejecting the Taxpayers' claim of hardship.

## B. *Exceptional Circumstances*

Taxpayers' claim of exceptional circumstances is also unavailing. Taxpayers argue that the Commissioner either waited too long after the Tax Court's decision in *Kelley* to

contact them with the amount of their liability, or simply took too long to determine their liability in the first place. The Commissioner responds that any delay is due to the length of time it took to negotiate a closing agreement with the TMPs of the partnerships in which Taxpayers had an interest. The delay, argues the Commissioner, was part and parcel of the legally-required procedures under TEFRA. Taxpayers rejoin that the legislative history of 26 U.S.C. § 7122 supports their position and in fact mandates the compromise of longstanding cases such as theirs. We hold that the Tax Court did not err in determining that the Commissioner did not abuse his discretion in rejecting Taxpayers' offer-in-compromise on the basis of exceptional circumstances.

Taxpayers raise three arguments based on exceptional circumstances. First, they claim that the Commissioner abused his discretion by applying the Treasury Regulations incorrectly in light of their authorizing statute, 26 U.S.C. § 7122.[3] Second, they claim that the Commissioner abused his discretion by flouting internal IRS guidelines with regard to offers-in-compromise. And third, they claim that the Commissioner abused his discretion by ignoring certain equity and public policy considerations. We reject each of these arguments.

### 1.    Incorrect application of the Treasury Regulations in light of their authorizing statute, 26 U.S.C. § 7122

**[6]** The bulk of Taxpayers' arguments with regard to exceptional circumstances concern whether the Commissioner misapplied the temporary Treasury Regulations issued pursuant to 26 U.S.C. § 7122. Specifically, Taxpayers contest the

---

[3]This claim could be construed as an argument that the Treasury Regulations themselves are in contradiction of their authorizing statute. However, Taxpayers explicitly disavow that interpretation, stating that "[i]t is the IRS *application* of the regulations to preclude abatement of interest which is an abuse of discretion." Opening Brief of Petitioner-Appellant at 21 n.8, *Fargo v. Comm'r*, No. 04-72190 (9th Cir. Jul. 13, 2004).

application of Temporary Treasury Regulation § 301.7122-1T(b)(4), which provides that the Commissioner may accept an offer-in-compromise if "exceptional circumstances exist such that collection of the full liability will be detrimental to voluntary compliance by taxpayers; and . . . [c]ompromise of the liability will not undermine compliance by taxpayers with the tax laws." Taxpayers contend that, following the Tax Court's opinion in *Kelley*, the delay in determining their liability constitutes exceptional circumstances.

[7] Taxpayers cite repeatedly to the legislative history of 26 U.S.C. § 7122, claiming that whatever regulations it authorizes should be used to accommodate compromise in long-standing cases where large amounts of interest have accrued, even though no such specification occurs in the statutory text.[4] However, as the Supreme Court has previously noted in the taxation context, "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity, but [i]n the absence of a clearly expressed legislative intention to the contrary, the language of the statute itself must ordinarily be regarded as conclusive." *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987) (internal quotation marks omitted) (citing *United States v. James*, 478 U.S. 597, 606 (1986)). The Tax Court has also recognized the primary value of statutory text, indicating that "[i]f the language of the statute is plain, clear, and unambiguous, we generally apply it according to its terms." *Montgomery v. Comm'r*, 122 T.C. 1 (2004) (citing, *inter alia*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Here, the authorization pro-

---

[4]Although this case is about compromise, not interest abatement, Taxpayers claim that the Tax Court incorrectly adopted the standards utilized in the interest abatement statute (26 U.S.C. § 6404) as controlling whether to accept an offer-in-compromise. However, the Tax Court does not so much as mention § 6404, let alone apply it. Instead, it merely mentions (and distinguishes) the interest abatement case *Beagles v. Commissioner*, 85 T.C.M. (CCH) 995 (2003). Taxpayers' erroneous line of reasoning seems to stem from certain background information to the final Treasury Regulations, which is analyzed *infra* Subsection 3.

vided by the statute is discretionary on its face, stating that "the Secretary *may* compromise any civil or criminal case arising under the internal revenue laws." 26 U.S.C. § 7122(a) (emphasis added). Discretion is also given to the Secretary of the Treasury to determine what standards will govern evaluation of an offer-in-compromise: "The Secretary shall prescribe guidelines for officers and employees of the Internal Revenue Service *to determine whether* an offer-in-compromise is adequate and should be accepted to resolve a dispute." 26 U.S.C. § 7122 (c)(1) (emphasis added).

Taxpayers contend that these authorizations of discretion are tempered by the statute's legislative history, which they say specifically contemplates compromise of longstanding cases where large amounts of fines and interest accrue. The House Conference Report, for instance, indicates that:

> [t]he conferees anticipate that, among other situations, the IRS *may* utilize this new authority to resolve longstanding cases by forgoing penalties and interest which have accumulated as a result of delay in determining the taxpayer's liability. The conferees believe that the ability to compromise tax liability and to make payments of tax liability by installment enhances taxpayer compliance. In addition, the conferees believe that the IRS *should* be flexible in finding ways to work with taxpayers who are sincerely trying to meet their obligations and remain in the tax system. Accordingly, the conferees believe that the IRS *should* make it easier for taxpayers to enter into offer-in-compromise agreements, and should do more to educate the taxpaying public about the availability of such agreements.

H. Conf. Rep. 105-599, at 289 (1998), reprinted in 1998 U.S.C.C.A.N. 288 (emphasis added). The Senate Report, also seeming to indicate that Congress hoped the IRS would be reasonably generous in accepting compromise, states that "[i]t

is anticipated that the IRS will adopt a liberal acceptance policy for offers-in-compromise to provide an incentive for taxpayers to continue to file tax returns and continue to pay their taxes." S. Rep. 105-174, at 90 (1998).

**[8]** These expressions of legislative intent, though relevant in support of Taxpayers' position, do not meet the threshold for proving the Commissioner's abuse of discretion. First, the authorizing statute remains explicitly discretionary, and in performing statutory interpretation the text must come first. Second, the legislative history at issue is, as the emphasis above shows, substantially discretionary as well. Congressional intent here is probative, but it does not show that the Commissioner made a decision "on an erroneous view of the law or a clearly erroneous assessment of the facts." *Morales*, 108 F.3d at 1035. Indeed, at least one court has held that not only is § 7122 discretionary, but it does not even confer the right to have one's offer considered. *See Christopher Cross, Inc. v. United States*, 363 F. Supp. 2d 855, 858 (E.D. La. 2004). In this case, however, we need not address the exact scope of § 7122 in such a manner; we hold only that the Commissioner did not abuse his discretion.

### 2. *Flouting of internal regulations with regard to compromise*

Taxpayers suggest that even if the IRS Appeals Officer was correct to determine that $7,500 was an inadequate offer, he was duty-bound by the Internal Revenue Manual to negotiate a better deal rather than reject the offer outright. The portion of the Manual to which Taxpayers cite does not exist under the current revisions, and they provide no date for reference. But even taking Taxpayers at their word that the Manual exhorts Appeals Officers to negotiate before rejecting an offer-in-compromise, their contention that they were owed a *duty* of negotiation is incorrect.

**[9]** The Internal Revenue Manual does not have the force of law and does not confer rights on taxpayers. This view is

shared among many of our sister circuits. *See, e.g.*, *Carlson v. United States*, 126 F.3d 915, 922 (7th Cir. 1997); *Marks v. Comm'r*, 947 F.2d 983, 986 n.1 (D.C. Cir. 1991) (holding that "[i]t is well-settled . . . that the provisions of the [Internal Revenue M]anual are *directory rather than mandatory*, are not codified regulations, and clearly do not have the force and effect of law" (emphasis added)); *see also Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir. 1996); *United States v. Horne*, 714 F.2d 206, 207 (1st Cir. 1983); *Einhorn v. DeWitt*, 618 F.2d 347, 349-50 (5th Cir. 1980).

[10] Further, even if the Manual does recommend negotiation, it contains numerous provisions that vest Appeals Officers with the discretion to accept or reject offers-in-compromise. *See, e.g.*, I.R.M. §§ 5.1.9.3.7.1 (Mar. 24, 2005), 8.1.1.2 (Feb. 1, 2003), 8.13.2.11 (Mar. 2, 2006). Each of these sections confers considerable discretion, militating against the existence of any duty to negotiate rather than reject. Even if some duty existed attendant to the Internal Revenue Manual, Taxpayers' argument does not show that the Commissioner abused his discretion.

### 3. Public policy and equity

[11] Taxpayers' final claim under the exceptional circumstances rubric is that a decision ruling against them will discourage future individuals from paying their taxes, because the delay in this case was outside of their control and thus unfairly punitive. The effective tax administration ground for compromise in Temporary Treasury Regulation § 301.7122-1T(b)(4) indicates that two conditions must be met: first, collection of the full liability must endanger "voluntary compliance by taxpayers," and second, compromise must "not undermine compliance . . . with the tax laws." In other words, compromise based on exceptional circumstances must alleviate potential present nonpayment while discouraging future nonpayment by others. Taxpayers and *amici* claim that the delay in this case, because it rested outside of the control of

Taxpayers, should not be held against them. *Amici* in particular are worried about the long-reaching effects of our decision in this case, fearing that individuals will be hoodwinked into tax shelters and then stung for the interest on their massive tax liabilities.[5] But this theory, even if plausible, simply does not fit into the regulatory scheme. In this case, a decision to collect the full liability will not discourage voluntary tax payment in the future, and a compromise could undermine the tax laws.

**[12]** The crux of Taxpayers' concerns seem to flow from the background information to the finalized Treasury Regulation § 301.7122-1(b), in which it is stated that:

> The IRS and Treasury Department do not believe that it would promote effective tax administration to authorize compromise solely on the basis of an asserted delay by the IRS, particularly delay that does not support relief under section 6404(e) . . . .

Compromise of Tax Liabilities, 67 Fed. Reg. 48,025, 48,027 (July 23, 2002) (codified at 26 C.F.R. pt. 301). From this statement, as noted *supra*, Taxpayers and *amici* draw the idea that the standard for offers-in-compromise is now the same as that for interest abatement, and delay on the part of the IRS can never constitute a valid ground for compromise. Thus, goes the argument, this case and others like it are being decided on a stricter standard than authorized by 26 U.S.C.

---

[5]In an error shared with *amici*, Taxpayers also assume that the Tax Court's decision here affects all "similarly situated" parties equally. We review the case before us, however, for abuse of discretion, which is highly case-specific. The fact that the Commissioner chose to reject Taxpayers' offer-in-compromise here does not mean that he will reject all similar offers in compromise in the future; indeed, that is the very definition of discretion. In addition, "exceptional circumstances" is not the only acceptable ground for accepting an offer-in-compromise. This case does not necessarily preclude other similarly-situated taxpayers from reaching a compromise with the IRS.

§ 7122, and that stricter standard also frustrates the policy goals of Treasury Regulation § 301.7122-1(b). This argument is undermined, however, by a quote later in the background information, which states that

> cases in which a taxpayer believes the liability was caused, in whole or in part, by delay on the part of the IRS or by the actions of third parties *may be appropriate* for compromise under the public policy and equity standard. Such cases, however, are expected to be rare, as the taxpayer must identify compelling public policy or equity concerns that satisfy the standard set forth above.

*Id*. (emphasis added). While Taxpayers chose to focus on the fact that such equity-based compromises will be "rare," the relevant question is merely whether the Commissioner has relinquished his discretion to compromise longstanding cases. He has not.

**[13]** Furthermore, in this instance the Commissioner has not abused his discretion by not accepting Taxpayers' offer-in-compromise. There are a number of factors cutting against Taxpayers which do not lend themselves towards relief on effective tax administration grounds: 1) Taxpayers invested in tax shelters, and purely tax-motivated transactions are frowned upon by the Code;[6] 2) no evidence was presented to suggest that Taxpayers were the subject of fraud or deception; 3) the delay that took place was due to well-established TEFRA procedures and the inability of Taxpayers' TMPs to negotiate quickly; and 4) the primary incentives created by requiring full payment are to encourage taxpayers to research future investments more carefully and to keep in better contact with financial agents (such as TMPs).[7] At the very least,

---

[6] *See, e.g.*, 26 U.S.C. § 6621 (applying a higher interest rate to past liabilities resulting from tax-motivated transactions).

[7] We note that the Tax Court indicated that even in the absence of an abuse of discretion by the Commissioner, Taxpayers may have a right of action against their TMPs for unnecessary delay, perhaps on grounds of breach of fiduciary duty. *Fargo*, 87 T.C.M. (CCH) 815.

the presence of these policy factors indicates that the Commissioner did not abuse his discretion in rejecting Taxpayers' offer on grounds of exceptional circumstances.

**AFFIRMED**.