T.C. Memo. 2007-30

UNITED STATES TAX COURT

ESTATE OF CAROL ANDREWS, DECEASED, ROBERT ANDREWS, SPECIAL
ADMINISTRATOR, AND ROBERT ANDREWS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18174-04L.          Filed February 7, 2007.

<u>Terri A. Merriam</u>, for petitioners.

<u>Gregory M. Hahn</u> and <u>Thomas N. Tomashek</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Petitioners filed a petition with this Court
in response to a Notice of Determination Concerning Collection
Actions Under Section 6330 (notice of determination) for 1981

through 1987.[1]  Pursuant to section 6330(d), petitioners seek review of respondent's determination.  The issue for decision is whether respondent abused his discretion in sustaining the proposed collection action.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, fourth, and fifth stipulations of fact and the attached exhibits are incorporated herein by this reference.[3]

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Amounts are rounded to the nearest dollar.

[2]  Petitioners also dispute respondent's determination that they are liable for the increased rate of interest on tax-motivated transactions under sec. 6621(c).  As to this dispute, the parties filed a stipulation to be bound by the Court's determination in Ertz v. Commissioner, T.C. Memo. 2007-15, which involves a similar issue.

[3]  Respondent reserved relevancy objections to many of the exhibits attached to the stipulations of fact.  Fed. R. Evid. 402 provides the general rule that all relevant evidence is admissible, while evidence which is not relevant is not admissible.  Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." While the relevance of some exhibits is certainly limited, we find that the exhibits meet the threshold definition of relevant evidence and are admissible.  The Court will give the exhibits only such consideration as is warranted by their pertinence to the Court's analysis of petitioners' case.

Respondent also objected to many of the exhibits on the basis of hearsay.  Even if we were to receive those exhibits into
(continued...)

Petitioners resided in Lodi, California, when they filed their petition. After filing the petition, but before trial, Carol Andrews (Mrs. Andrews) passed away from complications arising after surgery. At the time of her death, Robert Andrews (Mr. Andrews) and Mrs. Andrews (collectively referred to as petitioners) had been married for more than 33 years. At the time of trial, Mr. Andrews was 61 years old.

In 1984, petitioners became partners in Durham Genetic Engineering 1984-2, Ltd. (DGE 84-2), a cattle breeding partnership organized and operated by Walter J. Hoyt III (Hoyt). DGE 84-2 was also known as Timeshare Breeding Service 1984-2, Ltd. (TBS 84-2). After 1984, petitioners became partners in Durham Genetic Engineering 1985-4, Ltd. (DGE 85-4), another Hoyt partnership.[4]

From about 1971 through 1998, Hoyt organized, promoted, and operated more than 100 cattle breeding partnerships. Hoyt also organized, promoted, and operated sheep breeding partnerships. From 1983 to his subsequent removal by the Tax Court in 2000

---

[3](...continued)
evidence, they would have no impact on our findings of fact or on the outcome of this case.

[4] Petitioners were also partners in another Hoyt-related partnership identified as HS Truck. The details regarding HS Truck are not in the record. Though unclear, it appears that all adjustments made to petitioners' income tax liability for the years 1981-87 arose from their involvement in DGE 84-2 (or TBS 84-2) and DGE 85-4 only.

through 2003, Hoyt was the tax matters partner of each Hoyt partnership.  From approximately 1980 through 1997, Hoyt was a licensed enrolled agent, and as such, he represented many of the Hoyt partners before the Internal Revenue Service (IRS).  In 1998, Hoyt's enrolled agent status was revoked.  Hoyt was convicted of various criminal charges in 2000.[5]

Beginning in 1984 until at least 1987, petitioners claimed losses and credits on their Federal income tax returns arising from their involvement in the Hoyt partnerships.  Petitioners also carried back unused investment credits to 1981, 1982, and

---

[5] Petitioners ask the Court to take judicial notice of certain "facts" in other Hoyt-related cases and apply judicial estoppel to "facts respondent has asserted in previous [Hoyt-related] litigation".  We do neither.

A judicially noticeable fact is one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Petitioners are not asking the Court to take judicial notice of facts that are not subject to reasonable dispute.  Instead, petitioners are asking the Court to take judicial notice of the truth of assertions made by taxpayers and the Commissioner in other Hoyt-related cases.  Such assertions are not the proper subject of judicial notice.

The doctrine of judicial estoppel prevents a party from asserting in a legal proceeding a claim that is inconsistent with a position successfully taken by that party in a previous proceeding.  New Hampshire v. Maine, 532 U.S. 742, 749 (2001).  Among the requirements for judicial estoppel to be invoked, a party's current litigating position must be "clearly inconsistent" with a prior litigating position.  Id. at 750-751.  Petitioners have failed to identify any clear inconsistencies between respondent's current position and his position in any previous litigation.

1983.  As a result of these losses and credits, petitioners reported overpayments of tax for 1981 through 1987 and received refunds in the amounts claimed.

Respondent issued notices of final partnership administrative adjustments (FPAAs) to TBS 84-2 for its 1984 and 1985 taxable years, to DGE 84-2 for its 1986 taxable year, and to DGE 85-4 for its 1985 and 1986 taxable years.[6]  After completion of the partnership-level proceedings, respondent determined deficiencies in petitioners' income tax for their 1981 through 1987 tax years.

On August 21, 2001, respondent issued petitioners a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (final notice).  The final notice included petitioners' outstanding tax liabilities for 1981 through 1987.

On September 12, 2001, petitioners submitted a Form 12153, Request for a Collection Due Process Hearing.  Petitioners argued that the proposed levies were inappropriate, that an offer-in-compromise should be accepted, and that Mr. Andrews was entitled to innocent spouse relief under section 6015.

Petitioners' case was assigned to Settlement Officer Linda Cochran (Ms. Cochran).  Ms. Cochran scheduled a telephone section 6330 hearing for March 17, 2004.  During the hearing,

---

[6]  The FPAAs and other information specific to TBS 84-2's, DGE 84-2's, and DGE 85-4's partnership-level proceedings are not in the record.

petitioners' representative, Terri A. Merriam (Ms. Merriam), requested additional time to submit information.  Ms. Cochran extended petitioners' deadline for producing information to March 31, 2004.

On March 31, 2004, petitioners submitted to Ms. Cochran a Form 656, Offer in Compromise, a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, one letter setting forth medical and retirement considerations and explaining the offer amount, and three letters setting out in detail petitioners' position regarding the offer-in-compromise.  Petitioners' letters included several exhibits.

The Form 656 indicated that petitioners were seeking an offer-in-compromise based on either doubt as to collectibility with special circumstances or effective tax administration. Petitioners offered to pay $25,000 to compromise their outstanding tax liabilities for 1981 through 1996, which they estimated to be $255,254.

On the Form 433-A, petitioner listed the following assets:

| Asset | Current Balance/Value | Loan Balance |
|-------|----------------------|--------------|
| Checking accounts | $881 | n/a |
| Savings accounts | 53 | n/a |
| 401(k) plan account | 107,449 | -0- |
| Life insurance | 4,975 | $1,737 |
| 1998 Chevrolet Lumina | 2,465 | 303 |
| 1991 Chevrolet S-10 | 450 | -0- |
| 1988 Pontiac Grand Prix | -0- | -0- |
| House | 200,000 | 164,155 |
| Total | 316,273 | 166,195 |

The reported value of the section 401(k) plan account reflected only 70 percent of its then-current value. The reported value of the life insurance reflected its then-current cash value. The loan balance on the house included the balance on a mortgage ($121,155), and the balance on a home equity line of credit ($43,000).

Petitioners reported gross monthly income of $5,252, representing Mr. Andrews's wage income of $2,382, and Mrs. Andrews's pension/Social Security income of $2,870. Petitioners also reported the following monthly living expenses:

| Expense item | Monthly expense |
|---|---|
| Food, clothing, misc. | $1,005 |
| Housing and utilities | 1,756 |
| Transportation | 307 |
| Health care | 533 |
| Taxes (income and FICA) | 707 |
| Life insurance | 121 |
| Other secured debt | 460 |
| Other expenses | 458 |
| Total | 5,347 |

Petitioners did not explain the "other secured debt" or "other expenses".[7]

In the letter explaining the offer amount, petitioners stated that they were offering to pay $25,000 "in satisfaction for all years related to the Hoyt investment (1981 through 1996). Our retirement analysis shows that the Andrews will run out of funds in 2011, even without making the $25,000.00 payment. Thus, due to their age and medical concerns, $25,000.00 is a reasonable offer." The letter also included "medical and retirement considerations" and a "retirement analysis". Petitioners' medical and retirement considerations included: (1) Mrs. Andrews had suffered two heart attacks, underwent several angioplasties,

---

[7] It appears, however, that the other secured debt represented petitioners' monthly payment on their home equity line of credit, and the other expenses represented attorney's fees petitioner paid to Ms. Merriam's law firm in connection with the present litigation.

and had to take several medications; (2) due to her heart condition, Mrs. Andrews was forced to retire in March 2004; (3) Mr. Andrews suffered from depression and skin cancer; and (4) due to his health, Mr. Andrews expected to retire at 65 years old. The retirement analysis outlined the likelihood of increased housing and medical costs as petitioners aged. Petitioners also noted that Mr. Andrews had an innocent spouse case pending before the Tax Court at docket No. 19705-02.

In the remaining three letters, petitioners alleged that they were victims of Hoyt's fraud and asserted various arguments regarding the appropriateness of an offer-in-compromise.

On May 21, 2004, petitioners submitted another letter to Ms. Cochran, which included 42 exhibits not provided with the previous letters.

On August 25, 2004, respondent issued petitioners a notice of determination. In evaluating petitioners' offer-in-compromise, respondent made the following changes to the values of assets petitioners reported on the Form 433-A: (1) Respondent determined that the value of the section 401(k) plan account was $153,499 instead of $107,449 (the 70-percent value reported by petitioners) and reduced petitioners' net realizable equity by $35,700 to $117,799 to reflect estimated tax and penalties; and (2) respondent determined that the house was worth $350,000 instead of $200,000 and reduced petitioners' net realizable

equity by $164,155 to $185,845 to reflect the amount outstanding on the first and second mortgages.  Respondent concluded that petitioners had a total net realizable equity of $310,011.

Respondent accepted petitioners' reported gross monthly income of $5,252 but made the following adjustments to their monthly expenses:  (1) Reduced the housing and utilities expense from $1,756 to $1,254 because petitioners failed to document that they were entitled to an amount higher than the local guideline amount; and (2) disallowed the other expenses of $458 because petitioners failed to itemize expenses, but allowed the $460 of "other secured debt" because Ms. Cochran believed that amount represented the attorney's fees being paid to Ms. Merriam's law firm.  Regarding the possible future increases in expenses outlined in petitioners' letters, respondent determined that these were "general projections from the taxpayers' representative and may never, in fact, be incurred" and thus did not take them into account.

After making adjustments to petitioners' monthly expenses, respondent determined that $70,065 was collectible from their future income.[8]  Respondent concluded that petitioners had a reasonable collection potential of $380,076.

_____

[8]  Respondent determined that petitioners had monthly disposable income of $865 and multiplied this by 81, the number of months remaining on the collection statute.

Because petitioners had the ability to pay substantially more than the amount offered, respondent rejected their offer-in-compromise based on doubt as to collectibility with special circumstances. Respondent also rejected petitioners' effective tax administration offer-in-compromise based on economic hardship because they had the ability to pay their tax liability in full. Finally, respondent rejected petitioners' effective tax administration offer-in-compromise based on public policy or equity ground because the case "fails to meet the criteria for such consideration".

Respondent determined that petitioners did not offer an acceptable collection alternative and that all requirements of law and administrative procedure had been met. Respondent concluded that the proposed collection action could proceed, but that any activity against Mr. Andrews's assets should be stayed until his pending innocent spouse case had been decided.

In response to the notice of determination, petitioners filed a petition with this Court on September 27, 2004.

OPINION

Section 7122(a) provides that "The Secretary may compromise any civil * * * case arising under the internal revenue laws". Whether to accept an offer-in-compromise is left to the Secretary's discretion. Fargo v. Commissioner, 447 F.3d 706, 712

(9th Cir. 2006), affg. T.C. Memo. 2004-13; sec. 301.7122-1(c)(1), Proced. & Admin. Regs.

The regulations under section 7122(a) set forth three grounds for the compromise of a tax liability:  (1) Doubt as to liability; (2) doubt as to collectibility; or (3) promotion of effective tax administration.  Sec. 301.7122-1(b), Proced. & Admin. Regs.  Doubt as to liability is not at issue in this case.[9]

The Secretary may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the assessed liability.  Sec. 301.7122-1(b)(2), Proced. & Admin. Regs.  Generally, under the Commissioner's administrative pronouncements, an offer-in-compromise based on doubt as to collectibility will be acceptable only if it reflects the taxpayer's reasonable collection potential.  Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.  In some cases, the Commissioner will accept an offer-in-compromise of less than the reasonable collection potential if there are "special circumstances".  Id.  Special circumstances are:  (1) Circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the reasonable collection potential; or (2)

---

[9] While petitioners dispute their liability for sec. 6621(c) interest, see supra note 2, they did not raise doubt as to liability as a ground for compromise.

circumstances justifying acceptance of an amount less than the reasonable collection potential of the case based on public policy or equity considerations.  See Internal Revenue Manual (IRM) sec. 5.8.4.3(4).  However, in accordance with the Commissioner's guidelines, an offer-in-compromise based on doubt as to collectibility with special circumstances should not be accepted, even when economic hardship or considerations of public policy or equity circumstances are identified, if the taxpayer does not offer an acceptable amount.  See IRM sec. 5.8.11.2.1(11) and .2(12).

The Secretary may also compromise a tax liability on the ground of effective tax administration when:  (1) Collection of the full liability will create economic hardship; or (2) exceptional circumstances exist such that collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner; and (3) compromise of the liability would not undermine compliance by taxpayers with the tax laws.  Sec. 301.7122-1(b)(3), Proced. & Admin. Regs.

Petitioners proposed an offer-in-compromise based alternatively on doubt as to collectibility with special circumstances or effective tax administration.  Petitioners offered to pay $25,000 to compromise their outstanding tax liabilities for 1981 through 1996, which they estimated to be

$255,254. Petitioners argued that collection of the full liability would create economic hardship and would undermine public confidence that the tax laws are being administered in a fair and equitable manner. Respondent determined that petitioners' reasonable collection potential was $380,076 and that their offer-in-compromise did not meet the criteria for an offer-in-compromise based on either doubt as to collectibility with special circumstances or effective tax administration.

Because the underlying tax liability is not at issue, our review under section 6330 is for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 182 (2000). This standard does not ask us to decide whether in our own opinion petitioners' offer-in-compromise should have been accepted, but whether respondent's rejection of the offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Keller v. Commissioner, T.C. Memo. 2006-166; Fowler v. Commissioner, T.C. Memo. 2004-163. Because the same factors are taken into account in evaluating offers-in-compromise based on doubt as to collectibility with special circumstances and on effective tax administration (economic hardship or considerations of public policy or equity), we consider petitioners' separate grounds for their offer-in-compromise together. See Murphy v. Commissioner, 125 T.C. 301,

309, 320 n.10 (2005), affd. 469 F.3d 27 (1st Cir. 2006); <u>Barnes</u>
<u>v. Commissioner</u>, T.C. Memo. 2006-150.

A.   <u>Economic Hardship</u>

Petitioners assert that Ms. Cochran abused her discretion by
rejecting their offer-in-compromise because "There is no
indication that SO Cochran gave any substantive consideration to
Petitioners' demonstrated special circumstances or that they
would experience a hardship if required to make a full-payment."
In support of this assertion, petitioners argue:  (1) Ms. Cochran
failed to discuss petitioners' special circumstances in the
notice of determination; and (2) Ms. Cochran erroneously
determined petitioners' reasonable collection potential and
failed to take into account their future expenses.

Section 301.6343-1(b)(4)(i), Proced. & Admin. Regs., states
that economic hardship occurs when a taxpayer is "unable to pay
his or her reasonable basic living expenses."  Section 301.7122-
1(c)(3), Proced. & Admin. Regs., sets forth factors to consider
in evaluating whether collection of a tax liability would cause
economic hardship, as well as some examples.  One of the examples
involves a taxpayer who provides full-time care to a dependent
child with a serious long-term illness.  A second example
involves a taxpayer who would lack adequate means to pay his
basic living expenses were his only asset to be liquidated.  A
third example involves a disabled taxpayer who has a fixed income

and a modest home specially equipped to accommodate his disability, and who is unable to borrow against his home because of his disability. See sec. 301.7122-1(c)(3)(iii), Examples (1), (2), and (3), Proced. & Admin. Regs. None of these examples bears any resemblance to this case, but instead they "describe more dire circumstances". Speltz v. Commissioner, 454 F.3d 782, 786 (8th Cir. 2006), affg. 124 T.C. 165 (2005); see also Barnes v. Commissioner, supra. Nevertheless, we address petitioners' arguments.

1.    Discussion of Special Circumstances in the Notice of Determination

Petitioners argue that Ms. Cochran failed "to follow proper procedure by discussing Petitioners' special circumstances, what equity was considered in relation to their special circumstances, and how the special circumstances affected her determination of their ability to pay." Petitioners infer that, because the special circumstances were not discussed in detail in the notice of determination, Ms. Cochran failed to adequately take their circumstances into consideration.

We do not believe that Appeals must specifically list in the notice of determination every single fact that it considered in arriving at the determination. See Barnes v. Commissioner, supra. This is especially true in a case such as this, where petitioners provided Ms. Cochran with multiple letters and hundreds of pages of exhibits. As discussed below, Ms. Cochran

considered all of the arguments and information presented to her. Given the amount of information, it would be unreasonable to put the burden on Ms. Cochran to specifically address in the notice of determination every single asserted fact, circumstance, and argument presented. The fact that all of the information was not specifically addressed in the notice of determination was not an abuse of discretion.

2.   Petitioners' Income and Future Expenses

Petitioners assert that Ms. Cochran erroneously determined their reasonable collection potential by: (1) Considering 81 months of petitioners' future income instead of 48 months; and (2) failing to adequately consider their age, health and retirement status, medical costs, and the likelihood of future increases in medical and housing costs.[10] Petitioners' arguments are not persuasive.

Section 5.8.5.5 of the IRM provides that, when a taxpayer makes a cash offer to compromise an outstanding tax liability,

---

[10]   Additionally, petitioners argued on brief that Mr. Andrews has incurred additional costs arising from the illness and death of Mrs. Andrews. Petitioners cite Exhibit 427-P, an explanation of benefits from their insurance provider, as support for this argument. However, Exhibit 427-P was not offered for the truth of the matter asserted but was used only to show Mr. Andrews's understanding of what his medical bills might be. Further, Mr. Andrews testified that he was unsure as to how much, if any, of the medical bills he would ultimately be liable for. Because there is no evidence in the record that establishes Mr. Andrews will incur any additional costs, we reject petitioners' argument.

only 48 months of future income should be considered. Petitioners made a cash offer, but Ms. Cochran used 81 months of future income. At trial, Ms. Cochran acknowledged that she should have used only 48 months of future income. Ms. Cochran recomputed petitioners' reasonable collection potential using 48 months and determined that it was $351,531, instead of $380,076, as reflected in the notice of determination. Ms. Cochran testified that the change would not have had an effect on her final determination because, using either calculation, petitioners' reasonable collection potential was greater than their offer amount ($25,000). We find that Ms. Cochran's error did not amount to an abuse of discretion because, even when the error is corrected, petitioners' reasonable collection potential of $351,531 far exceeds their offer amount of $25,000.

With regard to age, health, and retirement status, petitioners' argument is not supported by the record. In their letter describing their offer amount, petitioners represented that Mrs. Andrews was retired and Mr. Andrews would retire when he reached 65 years old. Petitioners also indicated that they suffered from various medical conditions and that Mrs. Andrews was taking several medications. On their Form 433-A, petitioners reported monthly medical expenses of $533.

Ms. Cochran accepted petitioners' monthly medical expenses without change. Ms. Cochran also accepted petitioners'

representation that Mrs. Andrews was retired, and thus only considered her future income from pension/Social Security. While petitioners indicated that Mr. Andrews would retire at 65, he was only 59 at the time of the section 6330 hearing.[11] Thus, based on the information submitted by petitioners, Mr. Andrews would continue to work for at least 5 to 6 more years. Given that Ms. Cochran accepted petitioners' medical expenses as reported and considered future income consistent with the retirement considerations listed by petitioners, we reject petitioners' assertion that Ms. Cochran failed to consider petitioners' age, health, retirement status, and current medical costs.

Petitioners' argument is also unavailing with regard to the likelihood of future increases in medical and housing costs. Petitioners did not inform Ms. Cochran with any specificity that they would have to pay a greater amount of unreimbursed medical expenses in the future, or that their housing expenses would increase. Instead, they made general assertions about the increase of medical costs as people age and about the need for some seniors to seek in-home care or nursing home care or to make their houses handicapped accessible.

---

[11] In the letter explaining the offer amount, petitioners stated that Mr. Andrews was 62 instead of 59. However, petitioners listed Mr. Andrews's date of birth as September 5, 1944, which would mean that he was 59 years old on March 17, 2004 (the date of the sec. 6330 hearing).

As reflected in the notice of determination, Ms. Cochran took into consideration the information petitioners presented, but concluded that "these possible future expenses are general projections from the taxpayers' representative and may never, in fact, be incurred. The present offer, therefore, must be considered within the framework of present facts." Given the information presented to her, it was not arbitrary or capricious for Ms. Cochran to ignore these speculative future costs in making her final determination.

Petitioners also raise challenges to various other determinations made by Ms. Cochran, including: (1) The determination that their house had a value of $350,000; (2) the inclusion of 100 percent of the value of the section 401(k) plan account (less estimated tax and penalties); (3) the reduction of their housing and utilities expense; and (4) the disallowance of $460 in other expenses. We need not discuss in detail these and other minor disputes raised by petitioners. Even assuming arguendo that petitioners' income, expenses, and value of assets should have been accepted as reported, we would not find that Ms. Cochran abused her discretion in rejecting petitioners' offer-in-compromise.

Ms. Cochran testified that, had she accepted the income, expenses, and value of assets as reported, petitioners' reasonable collection potential would have been $160,146.

Petitioners offered to pay only $25,000 to compromise their outstanding tax liability, which they estimated to be $255,254. In some situations, respondent may accept an offer-in-compromise of less than petitioners' reasonable collection potential. However, given all other considerations discussed herein, we do not believe that Ms. Cochran abused her discretion by rejecting an offer-in-compromise that was only 10 percent of petitioners' outstanding tax liability and that bore no relationship to their ability to pay based on their own calculations.

3.    Encouraging Voluntary Compliance With the Tax Laws

We are also mindful that any decision by Ms. Cochran to accept petitioners' offer-in-compromise due to doubt as to collectibility with special circumstances or effective tax administration based on economic hardship must be viewed against the backdrop of section 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.[12]  See Barnes v. Commissioner, T.C. Memo. 2006-150.  That section requires that Ms. Cochran deny petitioners' offer-in-compromise if its acceptance would undermine voluntary compliance with tax laws by taxpayers in general.  Thus, even if we were to assume arguendo that petitioners would suffer economic hardship,

_____

[12]  The prospect that acceptance of an offer-in-compromise will undermine compliance with the tax laws militates against its acceptance whether the offer-in-compromise is predicated on promotion of effective tax administration or on doubt as to collectibility with special circumstances.  See Rev. Proc. 2003-71, 2003-2 C.B. 517; IRM sec. 5.8.11.2.3; see also Barnes v. Commissioner, T.C. Memo. 2006-150.

a finding that we decline to make, we would not find that Ms. Cochran's rejection of petitioners' offer-in-compromise was an abuse of discretion. As discussed below (in our discussion of petitioners' "equitable facts" argument), we conclude that acceptance of petitioners' offer-in-compromise would undermine voluntary compliance with tax laws by taxpayers in general.

B.  Public Policy and Equity Considerations

Petitioners assert that "There are so many unique and equitable facts in this case that this case is an exceptional circumstance" and respondent abused his discretion by not accepting those facts as grounds for an offer-in-compromise. In support of their assertion, petitioners argue:  (1) The longstanding nature of this case justifies acceptance of the offer-in-compromise; (2) respondent's reliance on an example in the IRM was improper; and (3) respondent failed to consider petitioners' other "equitable facts".

1.  Longstanding Case

Petitioners assert that the legislative history requires respondent to resolve "longstanding" cases by forgiving penalties and interest which would otherwise apply. Petitioners argue that, because this is a longstanding case, respondent abused his discretion by failing to accept their offer-in-compromise.

Petitioners' argument is essentially the same considered and rejected by the Court of Appeals for the Ninth Circuit in Fargo

v. Commissioner, 447 F.3d at 711-712.  See also Keller v. Commissioner, T.C. Memo. 2006-166;  Barnes v. Commissioner, supra.  We reject petitioners' argument for the same reasons stated by the Court of Appeals.  We add that petitioners' counsel participated in the appeal in Fargo as counsel for the amici.  On brief, petitioners suggests that the Court of Appeals knowingly wrote its opinion in Fargo in such a way as to distinguish that case from the cases of counsel's similarly situated clients (e.g., petitioners), and to otherwise allow those clients' liabilities for penalties and interest to be forgiven.  We do not read the opinion of the Court of Appeals in Fargo to support that conclusion.  See Keller v. Commissioner, supra; Barnes v. Commissioner, supra.

Respondent's rejection of petitioners' longstanding case argument was not arbitrary or capricious.

2.   The IRM Example

Petitioners argue that respondent erred when he determined that they were not entitled to relief based on the second example in IRM section 5.8.11.2.2(3).  Petitioners assert that many of the facts in this case were not present in the example, and, therefore, any reliance on the example was misplaced. Petitioners' argument is not persuasive.

IRM section 5.8.11.2.2(3) discusses effective tax administration offers-in-compromise based on equity and public

policy grounds and states in the second example:

> In 1983, the taxpayer invested in a nationally marketed partnership which promised the taxpayer tax benefits far exceeding the amount of the investment. Immediately upon investing, the taxpayer claimed investment tax credits that significantly reduced or eliminated the tax liabilities for the years 1981 through 1983. In 1984, the IRS opened an audit of the partnership under the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA). After issuance of the Final Partnership Administrative Adjustment (FPAA), but prior to any proceedings in Tax Court, the IRS made a global settlement offer in which it offered to concede a substantial portion of the interest and penalties that could be expected to be assessed if the IRS's determinations were upheld by the court. The taxpayer rejected the settlement offer. After several years of litigation, the partnership level proceeding eventually ended in Tax Court decisions upholding the vast majority of the deficiencies asserted in the FPAA on the grounds that the partnership's activities lacked economic substance. The taxpayer has now offered to compromise all the penalties and interest on terms more favorable than those contained in the prior settlement offer, arguing that TEFRA is unfair and that the liabilities accrued in large part due to the actions of the Tax Matters Partner (TMP) during the audit and litigation. Neither the operation of the TEFRA rules nor the TMP's actions on behalf of the taxpayer provide grounds to compromise under the equity provision of paragraph (b)(4)(i)(B) of this section. Compromise on those grounds would undermine the purpose of both the penalty and interest provisions at issue and the consistent settlement principles of TEFRA. * * *

1 Administration, Internal Revenue Manual (CCH), sec. 5.8.11.2.2(3), at 16,378. We agree with respondent that the example presents circumstances similar to those in petitioners' case, including: Petitioners invested in TEFRA partnerships in the early 1980s; petitioners' outstanding tax liability is related to their investment in the partnerships; FPAAs were

issued to the partnerships; after several years of litigation, Tax Court decisions upheld the vast majority of the deficiencies asserted in the FPAAs; and petitioners argue that interest has accumulated as the result of delays by and other actions of the tax matters partner.

Petitioners are also correct in asserting that not all the facts in their case are present in the example. However, it is unreasonable to expect that facts in an example be identical to facts of a particular case before the example can be relied upon. The IRM example was only one of many factors respondent considered. Given the similarities to petitioners' case, respondent's reliance on that example was not arbitrary or capricious.

### 3. Petitioners' Other "Equitable Facts"

Petitioners argue that respondent abused his discretion by failing to consider the other "equitable facts" of this case. Petitioners' "equitable facts" include reference to: (1) Petitioners' reliance on Bales v. Commissioner, T.C. Memo. 1989-568;[13] (2) petitioners' reliance on Hoyt's enrolled agent status;

---

[13] Bales v. Commissioner, T.C. Memo. 1989-568, involved deficiencies determined against various investors in several Hoyt partnerships. This Court found in favor of the investors on several issues, stating that "the transaction in issue should be respected for Federal income tax purposes." Taxpayers in many Hoyt-related cases have used Bales as the basis for a reasonable cause defense to accuracy-related penalties. This argument has been uniformly rejected by this Court and by the Courts of

(continued...)

(3) Hoyt's criminal conviction; (4) Hoyt's fraud on petitioners; and (5) other letters and cases. The basic thrust of petitioners' argument is that they were defrauded by Hoyt and that, if they were held responsible for penalties and interest incurred as a result of their investment in a tax shelter, it would be inequitable and against public policy. Petitioners' argument is not persuasive.

While the regulations do not set forth a specific standard for evaluating an offer-in-compromise based on claims of public policy or equity, the regulations contain two examples. See sec. 301.7122-1(c)(3)(iv), Examples (1) and (2), Proced. & Admin. Regs. The first example describes a taxpayer who is seriously ill and unable to file income tax returns for several years. The second example describes a taxpayer who received erroneous advice from the Commissioner as to the tax effect of the taxpayer's actions. Neither example bears any resemblance to this case. Unlike the exceptional circumstances exemplified in the regulations, petitioners' situation is neither unique nor exceptional in that their situation mirrors those of numerous other taxpayers who claimed tax shelter deductions in the 1980s

[13](...continued)
Appeals for the Sixth, Ninth, and Tenth Circuits. See, e.g., Hansen v. Commissioner, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo. 2004-269; Mortensen v. Commissioner, 440 F.3d 375, 390-391 (6th Cir. 2006), affg. T.C. Memo. 2004-279; Van Scoten v. Commissioner, 439 F.3d 1243, 1254-1256 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

and 1990s.  See <u>Keller v. Commissioner</u>, T.C. Memo. 2006-166;
<u>Barnes v. Commissioner</u>, T.C. Memo. 2006-150.

Of course, the examples in the regulations are not meant to
be exhaustive, and petitioners have a more sympathetic case than
the taxpayers in <u>Fargo v. Commissioner</u>, 447 F.3d at 714, for whom
the Court of Appeals for the Ninth Circuit noted that "no
evidence was presented to suggest that Taxpayers were the subject
of fraud or deception".  Such considerations, however, have not
kept this Court from finding investors in the Hoyt tax shelters
to be liable for penalties and interest, nor have they prevented
the Courts of Appeals for the Sixth, Ninth, and Tenth Circuits
from affirming our decisions to that effect.  See <u>Hansen v.
Commissioner</u>, 471 F.3d 1021 (9th Cir. 2006), affg. T.C. Memo.
2004-269; <u>Mortensen v. Commissioner</u>, 440 F.3d 375 (6th Cir.
2006), affg. T.C. Memo. 2004-279; <u>Van Scoten v. Commissioner</u>, 439
F.3d 1243 (10th Cir. 2006), affg. T.C. Memo. 2004-275.

Ms. Cochran testified that she considered all of Ms.
Merriam's and petitioners' assertions, including the numerous
letters and exhibits.  Nevertheless, Ms. Cochran determined that
petitioners did not qualify for an offer-in-compromise.

The mere fact that petitioners' "equitable facts" did not
persuade respondent to accept their offer-in-compromise does not
mean that those assertions were not considered.  The notice of
determination and Ms. Cochran's testimony demonstrate

respondent's clear understanding and careful consideration of the facts and circumstances of petitioners' case.  We find that respondent's determination that the "equitable facts" did not justify acceptance of petitioners' offer-in-compromise was not arbitrary or capricious, and thus it was not an abuse of discretion.

We also find that compromising petitioners' case on grounds of public policy or equity would not enhance voluntary compliance by other taxpayers.  A compromise on that basis would place the Government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which they enter.  It would be particularly inappropriate for the Government to play that role here, where the transaction at issue is participation in a tax shelter. Reducing the risks of participating in tax shelters would encourage more taxpayers to run those risks, thus undermining rather than enhancing compliance with the tax laws.  See Barnes v. Commissioner, supra.

C.    Petitioners' Other Arguments

1.    Compromise of Penalties and Interest in an Effective Tax Administration Offer-in-Compromise

Petitioners advance a number of arguments focusing on their assertion that respondent determined that penalties and interest could not be compromised in an effective tax administration

offer-in-compromise.  Petitioners argue that such a determination is contrary to legislative history and is therefore an abuse of discretion.  These arguments are not persuasive.

The regulations under section 7122 provide that "If the Secretary determines that there are grounds for compromise under this section, the Secretary may, at the Secretary's discretion, compromise any civil * * * liability arising under the internal revenue laws".  Sec. 301.7122-1(a)(1), Proced. & Admin. Regs.  In other words, the Secretary may compromise a taxpayer's tax liability if he determines that grounds for a compromise exist.  If the Secretary determines that grounds do not exist, the amount offered (or the way in which the offer is calculated) need not be considered.

Petitioners' arguments regarding the compromise of penalties and interest do not relate to whether there are grounds for a compromise.  Instead, these arguments go to whether the amount petitioners offered to compromise their tax liability was acceptable.  As addressed above, respondent's determination that the facts and circumstances of petitioners' case did not warrant acceptance of their offer-in-compromise was not arbitrary or capricious and was thus not an abuse of discretion.  Because no grounds for compromise exist, we need not address whether respondent can or should compromise penalties and interest in an

effective tax administration offer-in-compromise.  See <u>Keller v.</u>
<u>Commissioner</u>, <u>supra</u>.

2.  <u>Information Sufficient for the Court To Review</u>
    <u>Respondent's Determination</u>

Petitioners argue that respondent failed to provide the
Court with sufficient information "so that this Court can conduct
a thorough, probing, and in-depth review of respondent's
determinations."  Petitioners' argument is without merit.

Generally, a taxpayer bears the burden of proving the
Commissioner's determinations incorrect.  Rule 142(a)(1); <u>Welch</u>
<u>v. Helvering</u>, 290 U.S. 111, 115 (1933).[14]  The burden was on
petitioners to show that respondent abused his discretion.  The
burden was not on respondent to provide enough information to
show that he did not abuse his discretion.  Nevertheless, we find
that we had more than sufficient information to review
respondent's determination.

3.  <u>Deadline for Submission of Information</u>

Petitioners argue that Ms. Cochran abused her discretion by
not allowing their counsel additional time to submit information

---

[14]  While sec. 7491 shifts the burden of proof and/or the
burden of production to the Commissioner in certain
circumstances, this section is not applicable in this case
because respondent's examination of petitioners' returns did not
commence after July 22, 1998.  See Internal Revenue Service
Restructuring and Reform Act of 1998, Pub. L. 105-206, sec.
3001(c), 112 Stat. 727.

to be considered. Petitioners' argument is not supported by the record.

Petitioners assert that they were "initially only given weeks" to provide all information. However, they ignore the fact that Ms. Cochran granted their requested extension and allowed them until March 31, 2004, to submit information. Additionally, petitioners have not identified any documents or other information that they believe Ms. Cochran should have considered but that they were unable to produce because of the deadline for submission. Given the thoroughness and the amount of information submitted, it is unclear why petitioners needed additional time. We do not believe that Ms. Cochran abused her discretion by establishing a deadline for the submission of information.

4. Mr. Andrews' Pending Innocent Spouse Claim

At the time of the section 6330 hearing, Mr. Andrews had an innocent spouse case pending before the Tax Court at docket No. 19705-02. In their petition, petitioners argued that, because of Mr. Andrews's pending innocent spouse claim: (1) Respondent abused his discretion by considering the assets of both spouses; and (2) the notice of intent to levy was invalid against Mr. Andrews.

Petitioners did not argue on brief that respondent abused his discretion by considering the assets of both spouses.

Therefore, we conclude that petitioners have abandoned this argument.

Petitioners continued to argue on brief that the notice of intent to levy was invalid against Mr. Andrews. However, petitioners' concern that Mr. Andrews's property will be levied against before the resolution of his innocent spouse case is without merit. In the notice of determination, respondent specifically stated that any activity against Mr. Andrews's assets would be stayed until his pending innocent spouse case had been decided.

5. <u>Efficient Collection Versus Intrusiveness</u>

Petitioners argue that respondent failed to balance the need for efficient collection of taxes with the legitimate concern that the collection action be no more intrusive than necessary. See sec. 6330(c)(3)(C). Petitioners' argument is not supported by the record.

Petitioners have an outstanding tax liability. In their section 6330 hearing, petitioners proposed only an offer-in-compromise. Because no other collection alternatives were proposed, there were not less intrusive means for respondent to consider. We find that respondent balanced the need for efficient collection of taxes with petitioners' legitimate concern that collection be no more intrusive than necessary.

D.    <u>Conclusion</u>

Petitioners have not shown that respondent's determination was arbitrary or capricious, or without sound basis in fact or law.  For all of the above reasons, we hold that respondent's determination was not an abuse of discretion, and respondent may proceed with the proposed collection action as determined in the notice of determination.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.